## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TODD RAGSDALE,**

        **Plaintiff/Counter**                **Case No. 24-1170-DDC**
        **Defendant,**

**v.**

**STACY TIMMER & JACOB TIMMER,**

        **Defendants/Counter**
        **Claimants.**

## MEMORANDUM AND ORDER

This case is about a farming relationship turned sour. Plaintiff Todd Ragsdale and defendants Stacy and Jacob Timmer had an oral agreement for years. Under it, plaintiff, a farmer in north central Kansas, farmed defendants' land and, in exchange, he received two thirds of the crops produced. Defendants, ranchers from Colorado, then asked plaintiff to custom farm some additional land. Custom farming is a different type of relationship; plaintiff had no interest in the crops and, instead, only billed defendants for his services. Plaintiff also cared for defendants' cattle in Kansas.

Strife arose when defendants discovered that plaintiff had placed his cattle on defendants' pasture. Plaintiff insists that defendants gave him permission to do so, but defendants deny it. After discovering plaintiff's alleged trespass, defendants terminated the parties' entire relationship. They also refused to pay plaintiff for his custom-farming work.

Plaintiff has sued defendants for breach of the parties' oral contract. He contends that defendants failed to pay for his custom-farming services, and he also claims they failed to

reimburse him for input costs.  Defendants responded with a storm of counterclaims, seeking an accounting, and recovery for:  breach of contract, breach of fiduciary duty, fraud, Kansas Consumer Protection Act violations, and trespass.  Defendants insist they don't owe plaintiff anything because, highly summarized, he failed to follow certain fertilizer prescriptions, overcharged them for his services, overcharged them for inputs, under-reported crop yields, and failed to deliver crops.

Both parties have moved for summary judgment.  But the court can't resolve all disputes in such a fact-intensive case with so many conflicting stories at summary judgment.  Still, some of defendants' theories can't withstand summary-judgment scrutiny.  The court thus grants plaintiff's Motion for Summary Judgment (Doc. 78) in part.  And it denies defendants' Motion for Partial Summary Judgment (Doc. 76) in whole.

## I.     Background[1]

Before the court recites the facts, it must take up a preliminary issue:  plaintiff's request that the court strike the declaration of Casey Overton, submitted by defendants.  Doc. 85 at 3–6.

---

[1]     Defendants have violated the court's local rules twice with their summary-judgment briefing. Our local rules require double-spaced filings.  D. Kan. Rule 5.1(a).  But several pages of their summary-judgment response are 1.5 spaced.  Doc. 86 at 4–28.  This tactic circumvented the court's rule limiting summary-judgment responses to 40 pages.  D. Kan. Rule 7.1(d)(2).  When properly spaced, defendants' response brief is 46 pages.  The court could strike the final six pages of defendants' brief.  But because plaintiff didn't move to strike, the court won't do so.  The court nonetheless notes that it's unimpressed with counsel's disregard for our rules.

Defendants have committed a second violation.  In their reply to their own summary-judgment motion, they attached as an exhibit the summary-judgment facts that they deem uncontroverted.  Doc. 91-1.  This too violates our court's local rules.  Our local rules require summary-judgment briefs to encompass all summary-judgments facts as well.  D. Kan. Rule 7.1(d)(2); D. Kan. Rule 56.1(b)(1).  Repackaging facts as an exhibit is another obvious run at circumventing page limits.  The court routinely has struck filings like this one.  *Uhlig LLC v. CoreLogic, Inc.*, No. 21-2543-DDC, 2024 WL 1557626, at *1 (D. Kan. Apr. 10, 2024); *Orchestrate HR, Inc. v. Blue Cross & Blue Shield of Kan., Inc.*, No. 19-4007-DDC, 2024 WL 277893, at *2 (D. Kan. Jan. 25, 2024); *McCray v. McDonough*, No. 22-2154-DDC, 2023 WL 8005026, at *1–2 (D. Kan. Nov. 17, 2023).  So, the court strikes defendants' exhibit, Doc. 91-1, and will not consider it at summary judgment.

Overton worked at defendants' bank on defendants' loan for their farming and ranching operations. Defendants proffer Overton's declaration to show how they became suspicious of plaintiff's practices. Yet, at bottom, this is a breach-of-contract dispute. The legal questions that the court must answer don't turn on Overton's expectations or suspicions; she wasn't a party to the contract. To be sure, Overton triggered defendants' suspicions of plaintiff's billing. But it's what's actually on the bills that matters. So, the court doesn't require the Overton declaration to recount the facts in this dispute—it's simply irrelevant. Demonstrating the declaration's irrelevance, defendants never even cite the declaration in their legal analysis. *See* Doc. 77 at 31–38. Because the court needn't consider the irrelevant Overton declaration, the court denies plaintiff's request to strike it as moot. With this preliminary matter out of the way, the court turns to the facts.

### The Parties

Plaintiff is a farmer and rancher from Phillips County, Kansas. Doc. 79-1 at 1 (Pl. Aff. ¶ 4). Defendants are ranchers from Colorado who own and lease land in north central Kansas. Doc. 75 at 2 (PTO ¶ 2.a.ii.); Doc. 79-2 at 4 (S. Timmer Dep. 11:13–21). Plaintiff connected with defendants through his wife, Doc. 79-1 at 1 (Pl. Aff. ¶ 6), and the parties began a sharecropping

---

Casting stones from their glass house, defense counsel complains that plaintiff failed to brief his own summary-judgment response correctly because he addresses statements of fact together. Doc. 91 at 1. Defendants also chastise plaintiff for failing to include in his summary-judgment response his own statements of facts not covered by defendants' motion. *Id.* at 2. These complaints are bootless. The court appreciates plaintiff condensing the facts as much as possible. Defendants worry that plaintiff's practice means that the court can't tell which facts plaintiff tries to controvert. No need to worry; the court can grasp the controversy. Nor does the court need plaintiff to set out his own additional statement of facts in response to defendants' summary-judgment motion—he submitted his own summary-judgment motion, which captures all of plaintiff's facts. This mechanism is perfectly acceptable in a case with cross-motions for summary judgment.

In sum, plaintiff did what defendants could not: condensed, edited, and sacrificed where possible to submit a rule-compliant—*viz.*, double-spaced, 40-page—brief encompassing all facts. The court will not fault plaintiff for his effort.

relationship around 2008 or 2009, Doc. 79-2 at 14 (S. Timmer Dep. 79:10–13). Under the sharecropping arrangement, plaintiff farmed 273 acres for defendants and plaintiff received two thirds of the crops harvested, while defendants received the other third. *Id.* at 13 (S. Timmer Dep. 75:4–14); Doc. 75 at 2 (PTO ¶ 2.a.ii.). Remember those ratios; they'll become important later.

The parties had no disputes about the sharecropping arrangement for a long time. Doc. 79-3 at 15 (J. Timmer Dep. 122:18–25). And defendants gave plaintiff a power of attorney in connection with their crop-insurance policies. Doc. 77-1 at 1 (Crop Insurance Power of Attorney).

### The Trust Land & the Custom Farming Agreement

In 2021, defendants asked plaintiff to custom farm some additional land. Doc. 75 at 2 (PTO ¶ 2.a.iii.).[2] Custom farming differs from sharecropping. *Id.* In a custom-farming arrangement, the farmer doesn't receive any of the crops harvested. *Id.* Instead, the landowner pays the farmer a rate for services he provides. *Id.* Defendants wanted plaintiff to custom farm land owned by Stacy's[3] family trusts. *Id.* Defendants had asked the trustee, a bank, to lease the trust land to them on a cash-rent basis.[4] Doc. 79-6 at 5 (Swanson Dep. 23:3–10, 24:3–6).

---

[2]     The parties have many pointless squabbles over the facts. *Compare* Doc. 79 at 6 (asserting defendants lacked experience with row-crop farming), *with* Doc. 86 at 4 (controverting this fact to assert that defendant Stacy Timmer grew up on a farm and rode along with her farther during row-crop harvest and defendant Jake Timmer has done field work); *compare* Doc. 79 at 8 (asserting defendants contacted plaintiff to solicit custom farming services), *with* Doc. 86 at 5 (controverting this fact by asserting that defendants asked plaintiff "if he would be interested in helping them"). The parties seem to forget that only the *material* facts matter. There's no point in squabbling about facts that don't matter. The court has little interest in these sideshows. It thus confines its recounting of these events to facts material to the summary-judgment disputes.

[3]     Because the two defendants share the same last name, the court refers to each defendant by first name.

[4]     The parties dispute the quality of the trust land. The trustee bank's farm manager testified that the land was "low[ ]producing." Doc. 79-6 at 6 (Swanson Dep. 26:19–27:2). The farm manager noted

Plaintiff hesitated to enter a custom-farming arrangement with defendants to farm the trust land. Doc. 79-1 at 2 (Pl. Aff. ¶ 11). He never had custom farmed before.[5] *Id.* at 3 (Pl. Aff. ¶ 13). And defendants knew that plaintiff never had custom farmed before. Doc. 79-3 at 9 (J. Timmer Dep. 86:22–25). Defendants had their own inexperience. They'd never hired someone for custom farming of row crops before. Doc. 79-2 at 6–7 (S. Timmer Dep. 20:23–21:3).

In May 2022, the parties entered an oral agreement for plaintiff to provide custom-farming services to defendants. Doc. 79-1 at 3 (Pl. Aff. ¶ 16); Doc. 79-2 at 18 (S. Timmer Dep. 116:1–5). Plaintiff testified that he tends to farm the same way, whether he owns the field, sharecrops, cash rents, or custom farms. Doc. 77-13 at 5 (Pl. Dep. 35:4–8). Jacob testified that he wanted plaintiff "to do what he was doing on his own acres." Doc. 79-3 at 16 (J. Timmer Dep. 156:12–22).

---

that the land suffered from drought conditions in 2022. *Id.* at 8 (Swanson Dep. 35:19–36:4). Plaintiff's agronomist, for his part, testified that defendants' ground is "probably more in an average, to maybe a little bit lower" and "not terrible, either." Doc. 86-4 at 2, 6 (Van Laningham Dep. 21:2–14, 122:3–25). The agronomist testified that, comparatively, plaintiff's "ground is probably running a little bit better." *Id.* at 6 (Van Laningham Dep. 122:3–18). He then clarified that defendants' "ground is . . . not terrible, either. I mean, there's some rougher spots in some of that. But it's overall, good." *Id.* (Van Laningham Dep. 122:3–25).

From this testimony, each side of the caption naturally draws the conclusion most aligned with its interests: plaintiff insists that the trust land was bad, while defendants insist that the trust land was good. The court concludes that, for reasons that become clear in its analysis, the quality of the trust land doesn't matter to the summary-judgment analysis.

[5]    Defendants dispute this proposition, asserting that plaintiff reported custom-farming income in a 2021 financial statement. Doc. 86 at 5; Doc. 77 at 4. The relevant financial statement lists $6500 in "Custom Work." Doc. 82-1 at 2. Plaintiff has explained that this $6500 came from renting equipment to his son. Doc. 85-1 at 1–2 (Supp. Pl. Aff. ¶ 5). He explained that he used the "Custom Work" line on the financial statement to capture this income "because it was the easiest way to add equipment rental income on the form." *Id.* And plaintiff has clarified that he never has done custom-farming work outside of the work he performed for defendants. *Id.* Plaintiff used the same "Custom Work" column in a later financial statement, which defendants also complain about, but it's clear that "Custom Work" doesn't always mean custom farming. Doc. 87-1 at 2. The summary-judgment record thus leads to just one reasonable conclusion: plaintiff never had custom farmed before he started custom farming for defendants. Defendants' effort to dispute this fact falls well short.

It's undisputed that, as part of the custom-farming arrangement, all parties expected that plaintiff would prepare the ground, plant, apply fertilizer, apply chemicals, harvest, and transport crops. *Id.* at 20–21 (J. Timmer Dep. 180:8–181:24). The parties also don't dispute that defendants agreed to reimburse plaintiff for his actual costs. Doc. 79-1 at 4 (Pl. Aff. ¶ 20); Doc. 79-2 at 24 (S. Timmer Dep. 162:4–13); Doc. 79-3 at 20 (J. Timmer Dep. 179:22–180:7). But the parties heavily dispute their expectations about what plaintiff would charge for his services, and whether they reduced plaintiff's rates for his services to writing.

At first, plaintiff had no idea how much to charge for custom farming. Doc. 79-1 at 3 (Pl. Aff. ¶ 15). He researched custom-farming rates with the K-State extension office and provided defendants with rates from a K-State booklet. *Id.* The parties dispute the booklet plaintiff used. Plaintiff asserts that he used rates based on a 2018 or 2019 K-State booklet. *Id.* Defendants controvert this fact, insisting instead, that because plaintiff looked at the K-State booklet in 2022 he must have used the 2022 booklet. Doc. 86 at 6; *see also* Doc. 77-13 at 24 (Pl. Dep. 154:9–24). And K-State updates their custom-farming-rate booklet every two years. Doc. 86-2 at 9 (J. Timmer Dep. 193:17–25). This matters because, if plaintiff used an older booklet, then the parties should've expected his custom-farming rates to change. And plaintiff's custom-farming rates are a major point of contention in this litigation.

### *The Handwritten Document*

Plaintiff asserts that the parties never dedicated any part of their oral agreement on paper. Doc. 79-1 at 3 (Pl. Aff. ¶ 16). Defendants disagree. Defendants assert that plaintiff put his custom-farming rates into writing and provided those rates to defendants in the form of a handwritten document. The parties agree that this handwritten document exists. Plaintiff testified that he "wrote a deal down" for his custom-farming rates, based on the K-State custom-

6

farming booklet, and sent the handwritten document to defendants.  Doc. 77-13 at 23 (Pl. Dep. 151:1–22).  Each side has conflicting stories about the handwritten document.

Plaintiff, in his affidavit, testified that he sent defendants this handwritten document in January 2022, but he asserts that he intended for the handwritten document to provide defendants with a rough concept of his custom-farming costs—not to serve as a quote.  Doc. 79-1 at 3 (Pl. Aff. ¶ 15).[6]  Plaintiff further testified that he didn't know if defendants had agreed to the custom-farming rates, and he was "trying to give them an idea of where things could be."  Doc. 77-13 at 23 (Pl. Dep. 152:1–13).

Defendants insist that this handwritten document represents agreed-upon prices for plaintiff's custom-farming services.  Yet defendant Jacob testified that the parties didn't agree to any specific terms on the custom-farming arrangement.  Doc. 79-3 at 18 (J. Timmer Dep. 169:21–170:5).  Defendant Stacy, for her part, testified that she never talked to plaintiff about the handwritten document.  Doc. 79-2 at 19 (S. Timmer Dep. 117:17–24).  Jacob also testified that he and plaintiff never talked about defendants' expectations for the custom-farming arrangement.  Doc. 79-3 at 19 (J. Timmer Dep. 174:11–175:24).  To his credit, Jacob offered to "take partial blame for that."  *Id.* (J. Timmer Dep. 175:20–176:1).  And Jacob testified that he and plaintiff had just a "friend conversation" and didn't have a business conversation because plaintiff and defendants had worked together for a long time.  *Id.* at 20 (J. Timmer Dep. 177:16–25).

---

[6]    Defendants assert that plaintiff's affidavit tries to change his deposition testimony, and the court thus should disregard it.  Doc. 91 at 3.  The court rejects this assertion.  Plaintiff's affidavit and his deposition testimony are largely consistent.  Plaintiff testified that he didn't know if defendants agreed to the rates on the handwritten document and he'd merely tried to give them an idea of his prices.  Likewise, plaintiff's affidavit claims he didn't intend for the handwritten document to serve as a quote.  To the extent plaintiff's affidavit and deposition aren't consistent, the court finds plaintiff's deposition confusing, and the affidavit clears up this confusion.

Despite this testimony about the lack of specificity, Jacob also testified that he and Stacy had agreed to the prices on the handwritten document. *Id.* (J. Timmer Dep. 179:4–21). And it's undisputed. Plaintiff never updated the rates on the handwritten document, so plaintiff never informed them of any rate increases. Doc. 77-13 at 23 (Pl. Dep. 152:17–19).

When asked which numbers on the handwritten document might change, plaintiff started listing things other than his own labor—*i.e.*, chemicals, fuel rates, seed prices. *Id.* at 23–24 (Pl. Dep. 152:20–153:5). Defendants thus assert that plaintiff told them that only plaintiff's input costs would change over time and never told them that his labor costs would increase. Doc. 86 at 6. Yet Jacob testified that plaintiff's custom-farming rates increased in 2023, Doc. 79-3 at 20 (J. Timmer Dep. 179:2–21), and defendants don't challenge these rate increases as a breach of contract, Doc. 75 at 16 (PTO ¶ 4.b.). Also, Stacy testified that she understood that the handwritten document represented rates only for crop year 2022. Doc. 79-2 at 19 (S. Timmer Dep. 117:17–21).

In sum, the summary-judgment record is unclear whether the handwritten document is part of the parties' agreement. And it's also unclear what, exactly, defendants expected to happen to plaintiff's custom-farming rates over time.

### *2022*

Throughout 2022, plaintiff prepared the ground, planted, applied fertilizer, applied chemicals, harvested, and transported crops. Doc. 79-1 at 4 (Pl. Aff. ¶ 22). In 2022, plaintiff produced crops "nearly consistent with" his own crops. *Id.* (Pl. Aff. ¶ 24). Plaintiff also submitted a summary that shows the trust land's production compared to plaintiff's own fields and the county average:

| 2022 Crop | County Average (bu/ac) | Plaintiff's Average (bu/ac) | Custom-Farmed Average (bu/ac) |
|-----------|------------------------|------------------------------|-------------------------------|
| Corn | 64.8 | 54.62 | 49.29 |
| Beans | 17.9 | 6.28 | 18.88 |
| Milo | 64.6 | 70.27 | 38.67 |

Doc. 79-11 at 2 (Fowler Summary A).[7]  In November 2022, once the crop season ended, plaintiff

and defendants agreed to have Cooperative Producers, Inc. (CPI), a farmers' cooperative, sample

the trust land's soil.  Doc. 79-1 at 6 (Pl. Aff. ¶ 27).  Defendants were provided with the sample

results no later than February 2, 2023.[8]  *Id.*

---

[7]     Defendants fault the Fowler summary for deriving data from crop-insurance records.  Doc. 86 at
7–8.  Defendants complain that the crop-insurance records aren't accurate because crop insurance doesn't
track production if a crop produced over insurance coverage.  *Id.* at 8.  According to defendants,
plaintiff's financial consultant admits that crop-insurance reporting isn't accurate because it doesn't track
harvest production above the insurance guarantee.  *Id.* at 20 (citing Doc. 79-27 at 3 n.5 (Seymour
Summary B)).  In the footnote defendants cite, plaintiff's financial consultant addressed a field called
"Grandpa's Place" and noted a crop harvest over insurance guarantee, so, the financial consultant wrote,
"Production to Count for loss estimate was not determined by insurance adjuster."  Doc. 79-27 at 3 n.5
(Seymour Summary B).  This is defendants' smoking gun that—even though difficult to follow—
purportedly shows that crop-insurance data is unreliable.

        The court sees defendants' complaints as a red herring, not a smoking gun.  Plaintiff's financial
consultant has clarified that the footnote explains "that if there is no crop loss, then crop production is not
tracked for production in excess of insured coverage <u>for loss purposes</u>."  Doc. 92-3 at 1 (Supp. Seymour
Aff. ¶ 3) (emphasis in original).  The consultant explained it this way, "total bushel production is still
reported on the Claim Information & Deferral form by the insurance adjusters" and this information
simply exists on a different form.  *Id.*  The court thus rejects defendants' attempt to cast doubt on crop-
insurance data.  Indeed, defendants themselves rely heavily on crop-insurance data.  *See* Doc. 86 at 8
(relying on crop-insurance data to show that plaintiff stored a certain amount of corn in 2022).

[8]     Defendants attempt to controvert this fact, asserting that plaintiff didn't share CPI's soil-sample
results with them.  Doc. 86 at 9.  But the testimony defendants cite doesn't support their attempt.  Plaintiff
testified that he couldn't recall sharing soil samples with defendants for the *sharecrop* fields.  Doc. 86-3
at 6 (Pl. Dep. 129:12–22).  Plaintiff then testified that he did share the soil samples for the *trust* fields.  *Id.*
(Pl. Dep. 130:1–9).  As further confirmation, plaintiff has adduced an email from CPI's agronomist to
defendants with the soil-sample results, Doc. 79-22 at 2 (Pl. Ex. 12).

The parties have several disputes about plaintiff's 2022 farming. Plaintiff submitted invoices to defendants for the custom-farming work, and defendants paid those invoices. Doc. 79-1 at 4–5 (Pl. Aff. ¶ 25). But, because defendants assert that plaintiff had agreed to the rates on the handwritten document, they claim that plaintiff overcharged them on each invoice he submitted for services performed on the trust land in 2022. *See* Doc. 77 at 16–19. Beyond plaintiff's services, defendants dispute other charges on the 2022 invoices. Defendants also assert that plaintiff didn't deliver all their grain. The court considers these disputes later, in its analysis.

### *2023*

In 2023, plaintiff again performed custom-farming services for defendants on the trust land. He again prepared the ground, planted, applied fertilizer, applied chemicals, harvested, and hauled crops. Doc. 79-1 at 6 (Pl. Aff. ¶ 28). Based on CPI's soil sampling, CPI prescribed fertilizer amounts for defendants' land. *Id.* (Pl. Aff. ¶ 29). Plaintiff asserts that he used these fertilizer prescriptions, *id.*, but defendants heavily dispute this. The court considers the debate about the CPI fertilizer descriptions later.

Plaintiff's farming of the trust land achieved, in his view, reasonable yields. Here's how the trust land's yield stacked up against the county average:

| **Crop** | **Trust Land (bu/ac)** | **Phillips County Average (bu/ac)** |
|---|---|---|
| Corn | 77.25 | 66.53 |
| Soybeans | 23.09 | 17.92 |
| Milo | 53 | 51.73 |
| Wheat | 17.24 | 31.85 |

*Id.* (Pl. Aff. ¶ 31); Doc. 79-51 at 7 (Kehler Report). Plaintiff also asserts that the trust land's wheat yield outpaced his own production averages. Doc. 79-1 at 6 (Pl. Aff. ¶ 31). Defendants assert that comparing the trust land results to the county average isn't appropriate because

plaintiff instructed CPI on his yield goals, CPI prescribed fertilizer to enable plaintiff to meet those goals, but then plaintiff didn't apply the proper amount of fertilizer. Doc. 86 at 12. The court explains CPI next but, first, it summarizes the disputes about the plaintiff's 2023 farming.

Many disputes arise from plaintiff's 2023 farming. Plaintiff claims that defendants received all the grain he produced for them in 2023—both the trust land grain and the sharecrop grain, Doc. 79-1 at 6 (Pl. Aff. ¶ 30), but defendants heavily dispute this. Defendants also dispute the invoices plaintiff submitted in 2023 because, according to defendants, the 2023 invoices overcharged them for plaintiff's custom-farming services and marked up inputs.

### *CPI Precision Agriculture*

One of defendants' allegations of breach of contract centers on CPI's Precision Agriculture. Defendants' breach-of-contract theory goes like this: the parties agreed that plaintiff would farm defendants' fields exactly as he farmed his own. And, according to defendants, plaintiff utilized CPI's Precision Agriculture on his own fields, so he should've used it on theirs.

When plaintiff amended his Answer to defendants' Counterclaim, he admitted that defendants "utilized the CPI Precision Agriculture Program, not including 'FieldAlytics[.]'" Doc. 29 at 3 (Am. Answer ¶ 12).[9] Plaintiff also admitted that he informed defendants "that he had utilized the CPI Program for his own land."[10] *Id.* (Am. Answer ¶ 14). Plaintiff told

---

[9]     Fed. R. Civ. 56(c)(1)(A) (explaining that party moving for summary judgment may support facts with "admissions"); *Saghian v. Shemuelian*, 835 F. App'x 351, 353 (10th Cir. 2020) ("'[A]dmissions in the pleadings are binding . . . and may support summary judgment[.]'" (quoting *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990))).

[10]     Plaintiff now insists that a CPI Precision Agriculture Program doesn't exist as a program and instead calls CPI Precision Agriculture "a series of different services offered[.]" Doc. 85 at 7. There's some support in the summary-judgment record for this view. The CPI agronomist testified that Precision Agriculture is "just services that we offer, you know. It's not a set program." Doc. 79-8 at 6 (Van Laningham Dep. 41:2–6). The problem is that plaintiff's Amended Answer already called it a "CPI

defendants that he used CPI for soil samples, to understand the condition and needs of the soil better.  Doc. 77-13 at 20 (Pl. Dep. 129:4–10).  Indeed, for many years, plaintiff used CPI as his agronomist to sample his soil and recommend fertilizer application.  Doc. 75 at 2 (PTO ¶ 2.a.vi.); Doc. 79-1 at 4 (Pl. Aff. ¶ 19.b.).

CPI's many services include an agronomist prescribing fertilizer rates.  CPI can make fertilizer and other recommendations based on data that they get from farmers.  When plaintiff finished planting, he would download information from the John Deere system in his tractor.  Doc. 77-13 at 21 (Pl. Dep. 134:13–21).  He didn't share that information with CPI.[11]  *Id.*  CPI's agronomist testified that CPI never has collected data about plaintiff's fertilizer application.  Doc. 85-3 at 6 (Van Laningham Dep. 51:23–52:20).

Plaintiff attested that he never discussed precision fertilizer application with defendants.  Doc. 79-1 at 3 (Pl. Aff. ¶ 17).  In contrast, defendant Jacob testified that the parties had a "general conversation" about precision fertilizer application but didn't discuss specifics.  Doc. 86-2 at 6 (J. Timmer Dep. 156:3–19).  Jacob admitted that he never complained to plaintiff about access to the CPI program.  Doc. 85-6 at 9 (J. Timmer Dep. 168:6–22).  He also admitted that he "should have asked."  *Id.*  During the 2023 planting season, Jacob asked CPI's agronomist about access to CPI's information, and the agronomist explained that Jacob needed plaintiff's permission to access plaintiff's account.  *Id.* at 5 (J. Timmer Dep. 140:3–17).  Plaintiff gave his

---

Precision Agriculture Program."  Doc. 29 at 3 (Am. Answer ¶ 12).  And, as established above, this counts as an admission.

[11]    Defendants assert that plaintiff failed to share this data with CPI for just their fields.  Doc. 77 at 9.  Plaintiff's testimony doesn't support this assertion fully.  It's simply not clear whether plaintiff is saying he didn't share data with CPI for any field, or just for defendants' fields.  *See* Doc. 77-13 at 21 (Pl. Dep. 134:13–21).

permission one week later. *Id.* (J. Timmer Dep. 140:17–23). Defendant Stacy, for her part, knew little about CPI. Doc. 85-5 at 11 (S. Timmer Dep. 201:23–202:5).

Jacob further testified that they never talked about precision seed or chemical application, however. Doc. 79-3 at 16–17 (J. Timmer Dep. 155:19–157:2). Jacob had a very limited understanding of plaintiff's use of precision chemical application in his own operation. *Id.* at 17 (J. Timmer Dep. 157:3–14). Stacy, for her part, never talked to plaintiff about CPI. Doc. 79-2 at 20 (S. Timmer Dep. 126:17–23).[12]

### *CPI Fertilizer Prescriptions*

CPI utilized a soil analysis of plaintiff's fields to create field maps with zones, and plaintiff and CPI's agronomist worked together to set a yield goal for each zone. Doc. 77-13 at 14, 25, 26 (Pl. Dep. 106:3–12, 173:1–5, 180:3–10). Plaintiff and the CPI agronomist set yield goals for defendants' fields, too. *Id.* at 15 (Pl. Dep. 112:11–20). After they set these yield goals, plaintiff and the agronomist would work up a prescription for fertilizer. *Id.* at 16 (Pl. Dep. 113:11–22). CPI then provided variable rates for fertilizer application that suggested different fertilizer application rates for different field zones. *Id.* at 9 (Pl. Dep. 50:10–51:12). The CPI agronomist would email the fertilizer prescriptions to plaintiff, or bring over a thumb drive for plaintiff to use in his tractor. *Id.* at 17 (Pl. Dep. 120:4–11). The CPI agronomist testified that, if

---

[12] The parties mention "FieldAlytics," a software program that generates reports for CPI. Doc. 79-1 at 4 (Pl. Aff. ¶ 19.a.); Doc. 78-8 at 7 (Van Laningham Dep. 57:18–58:18). The CPI agronomist testified that he uses FieldAlytics for its detailed information on soil samples. Doc. 86-4 at 5 (Van Laningham Dep. 115:9–17). Jacob testified that defendants never discussed "FieldAlytics" with plaintiff. Doc. 79-3 at 17 (J. Timmer Dep. 157:24–158:8). Plaintiff testified that he doesn't use FieldAlytics. Doc. 79-1 at 4 (Pl. Aff. ¶ 19.a.). The court thus concluded that the evidence about FieldAlytics is irrelevant.

On the topic of data, the parties also discuss FieldView, another separate platform. The court similarly concludes that the evidence about FieldView is irrelevant.

plaintiff applied less fertilizer than CPI prescribed, it would surprise him.  Doc. 77-20 at 5 (Van Laningham Dep. 206:15–18).

Plaintiff deferred to CPI's fertilizer recommendations.  Doc. 77-13 at 15 (Pl. Dep. 109:4–12).  He found the recommendations mostly accurate and followed them most of the time.  *Id.* at 13 (Pl. Dep. 103:3–104:8).

Mat Hohner, a former farm hand who worked for plaintiff, testified, "we always had good luck with [CPI], with the [fertilizer] scrips being what we need."  Doc. 77-21 at 2, 5 (Hohner Dep. 10:20–25, 41:3–7).  He also testified that the tractor operator can't override the system on the planter or drill that applies the fertilizer at a variable rate prescribed by the fertilizer prescription.  *Id.* at 4 (Hohner Dep. 31:12–32:4).  He wouldn't want to override the fertilizer setting because to do so "maybe not be following whatever has talked about and agreed on" previously.  *Id.* (Hohner Dep. 32:5–14).  But, according to Hohner, plaintiff applied less fertilizer than called for by CPI's fertilizer prescription.  *Id.* at 10 (Hohner Dep. 103:15–104:2).

Hohner testified, "we would always go less, just to make it a littler cheaper because [the CPI prescription] was calling for an extreme amount"—that is, CPI called for "a high rate of fertilizer."  *Id.* (Hohner Dep. 104:5–15).  He also testified that they would deviate from CPI's prescription "if it was calling for a real high rate of fertilizer."  *Id.* at 5 (Hohner Dep. 41:11–20).  In that case, plaintiff would reduce the fertilizer rate to a "cost-effective" level that would still have enough product to help.  *Id.*  According to Hohner, plaintiff always would go lower than the prescription, he would never go over what CPI prescribed.  *Id.*  To change the prescription, plaintiff would use his computer to modify the rates on the CPI thumb drive.  *Id.* (Hohner Dep. 41:21–42:8).[13]

---

[13]    Plaintiff objects to Hohner's testimony, arguing it lacks foundation.  Hohner testified that his only involvement with CPI was helping to unload fertilizer.  Doc. 85-7 at 3 (Hohner Dep. 19:2–8).  Hohner

Defendants assert that, in 2023, plaintiff applied zero fertilizer to one-third of a field within the trust land. Doc. 77 at 8. That assertion doesn't match plaintiff's deposition testimony. In the deposition, defense counsel showed plaintiff a map, which counsel claims shows no fertilizer applied to one third of the field. Doc. 77-13 at 27 (Pl. Dep. 181:1–3). Counsel then asks, "Are you reading that the same way?" *Id.* (Pl. Dep. 181:4). Plaintiff responds, "Yes." *Id.* (Pl. Dep. 181:5). But reading a document means little; plaintiff never actually testified that he applied no fertilizer to a field.

To the contrary, plaintiff immediately went on to testify that the fertilizer application should match the CPI prescription. *Id.* (Pl. Dep. 181:6–8). When asked to explain why if, hypothetically, the fertilizer applied didn't match CPI's prescription, plaintiff explained that he turned the fertilizer from the prescription of 92 or 98 pounds per acre to 50 pounds per acre. *Id.* (Pl. Dep. 181:9–20). Plaintiff explained that he applied less fertilizer because, by this point in October 2023, defendants hadn't paid him. *Id.* (Pl. Dep. 182:9–15). Indeed, to this day, defendants haven't paid plaintiff for any of his 2023 custom-farming work.[14] Doc. 79-2 at 22 (S. Timmer Dep. 154:9–12).

---

said he preferred the simplicity of trucking, so he mostly performed that work. *Id.* at 6 (Hohner Dep. 46:1–22). Hohner didn't operate the sprayers—he just delivered the fertilizer to the sprayer—so he never operated any of the variable-rate controls. *Id.* at 3 (Hohner Dep. 19:21–20:1). Hohner also testified that he never planted or drilled any crops on defendants' fields. *Id.* at 4–5 (Hohner Dep. 32:24–33:7). His only involvement with defendants' fields was hauling fertilizer in or hauling grain out; he never planted, tilled, applied chemicals, or applied fertilizer to defendants' fields. *Id.*; *see also id.* at 13 (Hohner Dep. 103:4–6). And he never communicated with plaintiff or defendants about the custom-farming agreement. *Id.* at 11 (Hohner Dep. 84:13–16).

The court rejects plaintiff's objection. Hohner hauled fertilizer, which is "sufficient to support a finding that" he knew how much or how little fertilizer plaintiff applied. *See* Fed. R. Evid. 602 (standard required to show personal knowledge).

[14]     Defendant Stacy has submitted a declaration in which she asserts that plaintiff told defendants he was using CPI's fertilizer prescriptions, but plaintiff never shared the prescriptions with them and never mentioned that he had declined to follow CPI prescriptions on defendants' fields. Doc. 77-14 at 1 (S. Timmer Decl. ¶ 7). The court strikes this part of Stacy's declaration as a sham declaration.

### *Grain Hauling*

Defendants claim that some of their grain is missing.  Once a crop is harvested and loaded onto a semi, the semi can take the grain several places.  One of those places is a grain elevator.  At a grain elevator, the semi driver parks on the elevator's scale, and the elevator weighs the semi with its full load of grain.  Doc. 77-13 at 10 (Pl. Dep. 59:2–60:1).  The driver provides the elevator the landowner's information.  Doc. 85-7 at 7 (Hohner Dep. 52:15–21).  After the semi dumps the grain, the elevator re-weighs the semi and its empty trailer, then provides the driver with a weight-scale ticket.  Doc. 77-13 at 10 (Pl. Dep. 59:2–60:11).  This ticket provides the grain load's weight, the grain's owner, and other details.  *Id.* (Pl. Dep. 60:3–11).  The elevator provides proof of yield for crops stored at that specific elevator.  *Id.* at 37–38 (Pl. Dep. 252:21–253:6).

Instead of taking grain to the elevator, a farmer can self-store grain.  Plaintiff did just that; he hauled some grain from defendants' fields to his father's feedlot and stored it in grain bins there.  *Id.* at 12 (Pl. Dep. 67:24–68:7).  Plaintiff testified that he hauled defendants' grain

---

When deciding "whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements."  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  But a court "will disregard a contrary affidavit when . . . it constitutes an attempt to create a sham fact issue."  *Id.*  When deciding whether an affidavit or a declaration creates merely a sham fact issue, the pertinent factors include "whether the affiant was cross-examined during [her] earlier testimony, whether the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."  *Id.*

Here, Stacy testified at her deposition that she never discussed fertilizer prescriptions with plaintiff.  Doc. 85-5 at 10 (S. Timmer Dep. 197:1–198:10).  She also testified that plaintiff never told her that an agronomist would make fertilizer determinations.  Doc. 79-2 at 29 (S. Timmer. Dep. 196:2–9).  Yet Stacy's declaration asserts that plaintiff told defendants he was using CPI's fertilizer prescriptions.  Doc. 77-14 at 1 (S. Timmer Decl. ¶ 7).  The court disregards this second, contrary assertion based on the *Franks* factors just articulated.  Stacy was cross-examined during her deposition.  She certainly had access to her own knowledge at her deposition; there's no reason to think she discovered new personal knowledge after her deposition testimony.  And Stacy's earlier testimony reflects no confusion.

somewhere other than the elevator if the crop was too wet to take to the elevator.  Doc. 85-10 at 3 (Pl. Dep. 69:12–17).  Plaintiff explained that his bins have fans and heaters to dry the grain.  *Id.* (Pl. Dep. 70:3–10).  Plaintiff also testified that he hauled defendants' grain to the bins if the grain's test weight was too low and the elevator might deduct payment.  *Id.* (Pl. Dep. 69:12–70:2).  And those are the only two situations when plaintiff wouldn't take defendants' crops to the elevator.  *Id.* (Pl. Dep. 70:18–25).

Plaintiff's father, Robert, ran the scale at the feedlot and documented where the load originated.  Doc. 77-13 at 12 (Pl. Dep. 65:15–21).  Hohner, the farm hand, testified slightly differently; he testified that the driver operated the scale himself and recorded which field had originated the crop.  Doc. 85-7 at 9–10 (Hohner Dep. 60:3–61:2, 62:21–63:10). The feedlot scales also produced a weight ticket.  Doc. 77-13 at 11 (Pl. Dep. 64:18–24).

Hohner also testified that the feedlot bins typically stored corn, but sometimes stored wheat and milo.  Doc. 77-21 at 6 (Hohner Dep. 63:16–22).  Plaintiff maintains that Hohner is incorrect; he stored only corn from defendants' fields in the feedlot bins.  Doc. 85-1 at 3 (Supp. Pl. Aff. ¶ 8).  Indeed, plaintiff testified that he just hauled corn to the bins.  Doc. 79-58 at 7 (Pl. Dep. 269:5–13).  Plaintiff's father explained that Hohner wouldn't have known everything going on at the feedlot because he wasn't there all the time.  Doc. 85-9 at 3 (R. Ragsdale Dep. 52:9–23).

It's undisputed that plaintiff didn't tell defendants that he took crops from their fields to the feedlot.[15]  Doc. 77-14 at 2 (S. Timmer Decl. ¶ 9).

---

[15]     Plaintiff's father, Robert, testified that, as far he knew, all of defendants' grain went to the elevator.  Doc. 77-22 at 2 (R. Ragsdale Dep. 58:6–14).  Robert also testified, however, that only plaintiff knew where defendants' crops went; Robert wasn't involved in that decision.  Doc. 85-9 at 3 (R. Ragsdale Dep. 52:9–15).

Hohner, who drove a truck for plaintiff's operation, testified that everything from defendants' trust land went to the elevator. Doc. 85-7 at 7 (Hohner Dep. 49:25–50:13). He then described the slightly complicated process plaintiff's operation used to decide what to haul where. For the land plaintiff sharecropped with defendants, Hohner would weigh the load first, at either the elevator or the feedlot. *Id.* (Hohner Dep. 50:14–23). Then, plaintiff would adjust what to haul into the elevator for defendants' share. *Id.* (Hohner Dep. 50:14–51:1). For example, for corn—a crop plaintiff stored at his bins—the harvest crew would haul the first few loads to the bins at the feedlot. *Id.* at 8 (Hohner Dep. 53:14–54:12). Toward the end of a field, they'd calculate the yield utilizing the combine's yield monitor and the weight of the loads hauled off the field. *Id.* (Hohner Dep. 54:7–20). Then, they'd take the later loads to the elevator to cover defendants' share of the crop. *Id.* (Hohner Dep. 53:18–54:6). For corn, plaintiff confirmed that he added together the tickets from the elevator and the bins at the feedlot and, based on these calculations, ensured defendants' share went to the elevator. Doc. 77-13 at 39 (Pl. Dep. 269:5–25).

Hohner estimated that they used the elevator's scale around 90% of the time. Doc. 85-7 at 8 (Hohner Dep. 56:8–16). If they didn't take a semi to the elevator, they used the storage bins' scale, which produced a printout that was then separated by field. *Id.* at 9 (Hohner Dep. 58:24–59:14). And the driver would document the field where the load originated, and the landlord's name. *Id.* (Hohner Dep. 60:9–20). In sum, according to Hohner, "all the bushels were kept track of for each field." *Id.*

Defendants subpoenaed scale tickets from plaintiff's father's feedlot. Plaintiff's father testified that the feedlot doesn't have scale tickets for plaintiff's grain, nor for defendants' grain. Doc. 77-22 at 7 (R. Ragsdale Dep. 98:3–19). Plaintiff explained that, for the feedlot scales, he

18

and his father typically don't retain the scale tickets long term. Doc. 85-1 at 3 (Supp. Pl. Aff. ¶ 9). They provide the tickets to their crop-insurance company for proof of yield, then discard them. *Id.* Defendant Stacy, for her part, asserts plaintiff never provided defendants with weight tickets from the feedlot, Doc. 77-14 at 2 (S. Timmer Decl. ¶ 11), and that defendants' crop-insurance-agency records don't contain weigh tickets from the feedlot, Doc. 91-2 at 2 (S. Timmer Decl. ¶ 18).

Despite this kerfuffle about where to deliver grain, plaintiff asserts that defendants received their one-third share of grain through transfers at the elevator. Doc. 85-1 at 3–4 (Supp. Pl. Aff. ¶ 9). Plaintiff explained that when it came to defendants' grain—except grain delivered to the grain elevator—he transferred a like amount of grain into defendants' name at the elevator. *Id.* According to plaintiff, this "is a common practice in sharecropping as grain is fungible." *Id.*

### The Pasture Debacle

In May 2023, north central Kansas suffered from drought. Doc. 77-29 at 2 (J. Timmer Decl. ¶ 16). Drought affected every cattle rancher—plaintiff included. Doc. 77-13 at 29 (Pl. Dep. 189:9–20). That month, plaintiff, looking for a place to put his cattle on grass, texted defendant Jacob about sending a load of cattle to Colorado. *Id.* at 28–29 (Pl. Dep. 188:5–189:12). Jacob tried to locate available grass for plaintiff's cattle in Colorado. *Id.* at 29 (Pl. Dep. 189:21–190:11).

Jacob came to Kansas on May 18 to assess the conditions of his pasture and the trust's pasture, which defendants had begun leasing from the trust in 2022. Doc. 77-29 at 1, 2 (J. Timmer Decl. ¶¶ 11, 17). Following this assessment, Jacob and the trustee agreed to rest the pastures. *Id.* at 1, 2 (J. Timmer Decl. ¶¶ 12, 18–19). Jacob decided to take all of defendants' cattle back to Colorado. *Id.* at 2 (J. Timmer Decl. ¶ 20). And Jacob told plaintiff about this

decision. *Id.* (J. Timmer Decl. ¶ 21).  Jacob and plaintiff's son loaded defendants' cattle for the cattle's move to Colorado.  Doc. 77-13 at 29 (Pl. Dep. 192:5–8).

After defendants took their cattle to Colorado, plaintiff moved his cattle onto defendants' pastures.  Doc. 77-21 at 8 (Hohner Dep. 89:11–25).  Plaintiff testified that defendants gave him permission to do so in a phone call in early May, before defendants had moved their cattle to Colorado.[16]  Doc. 77-13 at 30–31 (Pl. Dep. 196:13–197:19).  Plaintiff's son testified that his father had mentioned that he'd received a call from defendants and defendants said it was okay for plaintiff to put his cattle on defendants' property.[17]  Doc. 79-59 at 4 (T. Ragsdale Dep. 50:5–11).  Plaintiff also documented his pasture usage.  Doc. 79-55 at 11 (Cattle Logs).  When asked why defendants would allow someone to put cattle on pastures after deciding not to use the pastures out of concern for their condition, plaintiff responded, "I don't know."  Doc. 77-13 at 31 (Pl. Dep. 199: 20–25).

Defendants have testified that they did not give plaintiff permission to put cattle on their pastures.  Doc. 77-14 at 6 (S. Timmer Decl. ¶ 55); Doc. 77-29 at 2 (J. Timmer Decl. ¶ 23).

---

[16]     Plaintiff implies that defendants have lied about this phone call based on suspicious discovery activity.  Defendant Stacy testified that she didn't recall any phone calls with plaintiff in May 2023.  Doc. 79-2 at 27 (S. Timmer Dep. 175:4–18).  And defendant Jacob testified he might have talked to plaintiff in the second half of May, but never in the first half.  Doc. 79-3 at 23 (J. Timmer Dep. 225:17–226:25). Defendants then produced phone records through May 11, and none showed any lengthy calls with plaintiff.  Doc. 79-53 (Timmer Phone Logs 5/5/25).  Next, plaintiff issued a specific document request for the rest of the phone logs.  Doc. 79-1 at 7 (Pl. Aff. ¶ 40).  Defendants produced the rest of the phone logs, which showed a 27-minute phone call between plaintiff and defendants on May 12—one day outside the date of defendants' initial production.  Doc. 79-54 at 6 (Timmer Phone Logs 6/16/25).  And, contrary to Jacob's testimony, those phone records show several calls to plaintiff in early May.  *See id.* at 5.

[17]     Defendants assert that plaintiff told his son that plaintiff didn't have permission to put his cattle on defendants' pastures.  Doc. 77 at 27.  Indeed, plaintiff's son testified as much.  Doc. 77-30 at 3 (T. Ragsdale Dep. 30:18–23).  But, later in his deposition, plaintiff's son clarified that plaintiff made that statement in November 2023, after the cattle were removed.  Doc. 85-17 at 3 (T. Ragsdale Dep. 49:1–11). Plaintiff's son submitted a declaration clarifying his deposition testimony.  Doc. 85-2 at 2 (T. Ragsdale Decl. ¶ 7).

Plaintiff removed the calves in September 2023, and removed the rest of his cattle from defendants' pastures in November 2023.[18]  Doc. 79-1 at 8 (Pl. Aff. ¶ 41); Doc. 79-56 at 5–6 (R. Ragsdale Dep. 84:19–85:10).  The parties dispute the pastures' condition after plaintiff's cattle finished grazing on the pasture.  Defendants submitted photos of the pastures and assert that these photos show bare pasture.  Doc. 77 at 28.  Here's one photo:



Doc. 77-35 (Pasture Photo).  One of defendants' friends, Angela Bond, took this photo and testified that, based on her experience growing up on a farm, the pasture is bare, with no grass remaining for grazing.  Doc. 77-32 at 2 (Bond Dep. 10:16–11:20).  Plaintiff points out that Bond took her photos from the road, by the front gate—the most trafficked part of the pasture.  Doc. 85-21 at 4 (Bond Dep. 15:3–12).

Plaintiff didn't see defendants between May and November of 2023.  Doc. 77-13 at 32 (Pl. Dep. 204:10–15).  In November, defendant Jacob texted plaintiff and asked if his cattle had

---

[18]      Hohner, plaintiff's farmhand, suggested that they had removed all of plaintiff's cattle in November 2023, and doesn't mention any September movement.  Doc. 77-21 at 9 (Hohner Dep. 98:14–21).  This discrepancy in the summary-judgment record is immaterial.  It's also not clear if plaintiff took the bulls off of the pasture in September or if he never had bulls on pasture there.  Doc. 79-56 at 5–6 (R. Ragsdale Dep. 84:19–85:10).

grazed on defendants' pastures.  Doc. 79-57 at 2 (Texts).  In late November, Jacob told plaintiff that they had "a lot to settle up on so until then stay off of everything we have[.]"  *Id.* at 3 (Texts).  Plaintiff tried to talk to defendants, and informed Jacob that he'd planned either to pay for the pasture usage or reduce his farming bills accordingly.  *Id.*  Jacob responded that he didn't want to talk and explained that he'd wanted to leave the pastures alone, given the drought.  *Id.*  Jacob said, "We wouldn't have agreed to you using or leasing any of it . . . .  You stole it."  *Id.*  Plaintiff responded, "I'm sorry you feel that way.  I've never taken advantage of you in any way.  I wouldn't have put cattle on there without you or Stacy's guidance."  *Id.*  Defendants then terminated their relationship with plaintiff.  Doc. 79-1 at 8 (Pl. Aff. ¶ 42).

Defendant Jacob attested that plaintiff, by putting cattle on pasture owned by the trust, put defendants at risk of losing both the pasture lease from the trust and the ability to farm the trust land.  Doc. 77-29 at 2 (J. Timmer Decl. ¶ 25).  Jacob testified that the pasture lease with the trust didn't allow defendants to sublease the trust land pasture.  Doc. 77-15 at 2 (J. Timmer Dep. 97:24–98:6).  But Jacob doesn't claim expertise in interpreting legal documents.  And, contrary to Jacob's testimony, the pasture lease provides that defendants couldn't *assign* the lease to another.  Doc. 77-19 at 1 (Pasture Lease).  It doesn't provide that defendants couldn't *sublease* the pasture to a third party.

When plaintiff took his cattle off defendants' pastures, the cattle were in good condition and had gained weight.  Doc. 77-22 at 5 (R. Ragsdale Dep. 91:3–9).  Plaintiff testified that he "probably" could have kept his cattle on his own land from May to November 2023.  Doc. 77-13 at 32–33 (Pl. Dep. 204:24–205:4).  Instead, plaintiff put his cattle on defendants' land and, as a result, his cattle didn't require as much of plaintiff's hay as they otherwise would have.  *Id.* at 33 (Pl. Dep. 205:5–15).  Plaintiff testified further that, if defendants' pastures were unavailable, he

probably could've put half of the cattle on his own pastures, and maybe more. *Id.* (Pl. Dep. 208:21–25).

### Defendants' Response to the Alleged Trespass

Before defendants learned of plaintiff's alleged trespass, they'd planned to haul 160 cattle to Kansas for the winter to graze on stalk residue, hay, and in pastures, under plaintiff's supervision. Doc. 77-29 at 2 (J. Timmer Decl. ¶ 28). Instead, defendants kept their cattle in Colorado, based on (i) the Kansas pastures' condition after plaintiff's cattle had grazed there over the summer and fall and (ii) they no longer trusted plaintiff. *Id.* (J. Timmer Decl. ¶ 29). Defendants didn't know or trust anyone else available to manage a herd in north central Kansas. *Id.* (J. Timmer Decl. ¶ 30). Stacy complains that plaintiff, after his alleged trespass, didn't identify any locations in Kansas where they could graze their cattle. Doc. 77-14 at 5 (S. Timmer Decl. ¶ 54).

So, defendants kept their cattle in Colorado that winter and incurred costs feeding them. Doc. 77-29 at 3 (J. Timmer Decl. ¶ 31). But they had a late start; they only started preparing to feed their cattle in November 2023. *Id.* (J. Timmer Decl. ¶ 32). Defendants didn't have the necessary hay supply arranged and, given the late hour before winter, faced limited hay availability and increased hay costs. *Id.* (J. Timmer Decl. ¶ 33). In defendants' view, all costs incurred feeding their cattle in Colorado that winter were necessary costs because of the condition of the pastures. *Id.* (J. Timmer Decl. ¶ 34).

Plaintiff disputes defendants' post-alleged-trespass woes. In his view, defendants had a variety of options that didn't require them to keep their cattle in Colorado. The court examines these purported options, below.

Plaintiff testified that defendants couldn't have brought their cattle back to Kansas no matter what plaintiff did because one doesn't graze cattle on grass pastures in Kanss over the

23

winter.  Doc. 79-1 at 8 (Pl. Aff. ¶ 43).  Instead, according to plaintiff, Kansas ranchers place

cattle on cover crops, crop residue, and crop stalks.  *Id.*  Plaintiff moved his cattle off of

defendants' pastures in 2023 because it was time for them to go to corn stalks.  Doc. 79-59 at 5

(T. Ragsdale Dep. 15:6–11).  Plaintiff's father confirmed that they, in their process, put cattle on

corn or milo stalks until February.  Doc. 79-56 at 4 (R. Ragsdale Dep. 50:11–25).  Indeed,

plaintiff testified that he did just that with his cattle and defendants' cattle the prior year.  Doc.

79-1 at 8 (Pl. Aff. ¶ 43).  Defendant Jacob disputes this; he testified that defendants initially

grazed their cattle on their pastures in the winter of 2021.  Doc. 86-2 at 5 (J. Timmer Dep.

105:4–106:11).

       Plaintiff further insists that defendants' pastures would've had insufficient grass until the

following summer, regardless of what he'd done.  Doc. 79-1 at 8 (Pl. Aff. ¶ 44).  Defendants

point out, however, that they'd used the pastures over the winter in a prior year.  Doc. 86-2 at 5

(J. Timmer Dep. 105:4–106:11).

       Plaintiff asserts that defendants had available crop residue and crop stalks that they

could've used for winter grazing.  Doc. 79-1 at 8 (Pl. Aff. ¶ 45).  Plaintiff also had baled feed

from defendants' land and had that feed available for feeding defendants' cattle, should the cattle

consumer all of the crop stalks.  *Id.* at 8 (Pl. Aff. ¶ 46).  Plaintiff thus maintains that his use of

defendants' pasture didn't affect defendants' winter options for cattle feed in Kansas.  *Id.* (Pl.

Aff. ¶ 43).  And plaintiff asserts that defendants had no reason to keep their cattle in Colorado

based solely on his use of their pastures.  *Id.* (Pl. Aff. ¶ 46).  The trust land's trustee testified that

defendants had fall crops on the trust land and the stalks could have served as livestock feed—a

practice the trust had used before.  Doc. 79-6 at 10 (Swanson Dep. 44:3–16).  The trustee also

testified that defendants haven't explained why they didn't use the stalks as feed for cattle in the fall of 2023. *Id.* (Swanson Dep. 44:17–20).

Defendants, for their part, assert that they didn't put their cattle on stalks or utilize the hay that plaintiff had baled because they didn't have anyone in north central Kansas to care for their cattle. Doc. 79-2 at 12 (S. Timmer Dep. 61:10–62:1). Stacy testified that having someone to watch their cattle was "a huge part" of their decision. *Id.*

Stacy also testified that she didn't look into additional pastures for their cattle in December 2023. *Id.* Jacob confirmed that they didn't look into additional pasture because (i) it was almost December, (ii) he didn't know if any pasture was available, and (iii) his fractured relationship with plaintiff made him uncomfortable hiring someone else. Doc. 79-3 at 25 (J. Timmer Dep. 241:17–242:6). Jacob also testified that, at that point, he was angry, so he "wasn't going to bring cattle out here and put around that again." *Id.* (J. Timmer Dep. 242:7–10).

Plaintiff's pasture expert opined that, after November, cattle are typically moved onto stalks, like corn or milo stalks. Doc. 79-62 at 4 (Kehler Aff. ¶ 7.a.).

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). "Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

The moving party bears "'both the initial burden of production on a motion for summary

judgment and the burden of establishing that summary judgment is appropriate as a matter of

law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.*

*Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO,*

*Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its

pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those

dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81

F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at

671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

When deciding whether the parties have shouldered their summary judgment burdens, "the

judge's function is not . . . to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut."

*Celotex*, 477 U.S. at 327.  To the contrary, it's an important procedure "designed 'to secure the

just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

While a court can treat cross motions for summary judgment separately, and "the denial of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979), it also may address the legal arguments together, *Berges v. Standard Ins.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010). Here, the two motions, and their legal arguments, overlap—and substantially so. Indeed, each side invokes and incorporates their own summary-judgment briefing and oppose the other's summary-judgment motion. The court thus exercises its discretion and addresses the legal arguments made by the dueling motions together. By far, it's the most efficient alternative.

## III.    Analysis

Plaintiff's claims are straightforward. He brings claims for breach of contract and, in the alternative, unjust enrichment. He also seeks pre-judgment interest. Plaintiff seeks summary judgment in his favor on all his claims. He also seeks summary judgment against defendants' counterclaims.

Defendants bring six counterclaims:

1. Accounting;

2. Breach of contract;

3. Breach of fiduciary duty;

4. Fraud;

5. Kansas Consumer Protection Act violations; and

6. Trespass.

Doc. 75 at 16–17 (PTO ¶ 2.b.). Their motion seeks summary judgment in their favor on counterclaims two, three, four, and five. For counterclaim six, defendants ask the court to declare their response to plaintiff's trespass reasonable as a matter of law.

The court begins its analysis with the parties' overlapping breach-of-contract claims. Based in part on its breach-of-contract conclusions, the court then addresses defendants' counterclaims, in the order just articulated.[19]  The summary-judgment version of the facts about sharecropping and custom farming are relevant to each claim.  The facts about the pasture debacle matter to the fiduciary-duty claim—but only slightly.  The pasture dispute's facts—the summary-judgment edition of those facts, that is—matter more for the trespass claim.

## A.    Breach of Contract

Plaintiff's breach-of-contract claim is simple:  defendants haven't paid him for the goods and services he claims he provided in 2023.  *Id.* at 12 (PTO ¶ 4.a.).  Alternatively, plaintiff claims unjust enrichment.  *Id.*  Defendants' breach-of-contract claim is more complicated, alleging multiple breaches of each farming agreement—the sharecropping contract and the custom-farming contract.  *Id.* at 16 (PTO ¶ 4.b.).  The bulk of the court's breach-of-contract analysis focuses on the counterclaims.

Start with the basics.  A breach-of-contract claim under Kansas law has five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."  *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013).

---

[19]    The parties agree.  Kanas law governs this action.  Doc. 75 at 1 (PTO ¶ 1.d.).  The court concurs. In diversity cases like this one, the court "applies the forum state's choice-of-law rules to determine which state's substantive law governs a claim."  *Nordwald v. Brightlink Commc'ns, LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Where, as here, "a party fails to make 'a clear showing that another state's law should apply,' Kansas choice of law principles require a court to default to Kansas substantive law."  *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (quoting *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007)).

The first dispute the court must decide is whether the handwritten document became part of the terms of the custom-farming agreement.  The court tackles this dispute next.  The court then moves to defendants' many theories of breach.

### 1.    Terms of the Custom-Farming Agreement

The parties agree that two oral contracts exist:  the sharecropping agreement and the custom-farming agreement.  And no one disputes the terms of the sharecropping agreement.  But the parties dispute whether the oral custom-farming contract included terms dictating the rates for plaintiff's custom-farming services, as recorded on the handwritten document plaintiff provided.  Though each side insists that the summary-judgment evidence supports its view, the court must disagree.

"Whether a contract exists depends on the intentions of the parties and is a question of fact."  *Unified Sch. Dist. No. 446 v. Sandoval*, 286 P.3d 542, 546 (Kan. 2012).  But, if "the legally relevant facts are undisputed, the existence and terms of a contract raise questions of law for the court's determination."  *Id.*  Here, the legally relevant facts remain murky—too murky for the court to resolve at summary judgment.

Plaintiff testified that he didn't know if the rates were agreed to; instead, he provided the handwritten document to "try[] to give them an idea of where things could be."  Doc. 77-13 at 23 (Pl. Dep. 152:1–13).  His affidavit reasserts that he intended for the handwritten document to prove a rough concept—not to serve as a quote.  Doc. 79-1 at 3 (Pl. Aff. ¶ 15).  Plaintiff thus planned to raise his rates, yet he never informed defendants of any such raise.  Doc. 77-13 at 23 (Pl. Dep. 152:17–19).

Defendant Jacob testified that he and defendant Stacy had agreed to the prices on the handwritten document.  Doc. 79-3 at 20 (J. Timmer Dep. 179:4–21).  Jacob also testified, however, that he never discussed specifics with plaintiff.  *Id.* at 18 (J. Timmer Dep. 169:21–

170:5).  And Stacy testified that she never discussed the handwritten document with plaintiff.

Doc. 79-2 at 19 (S. Timmer Dep. 117:17–24).  This all boils down to a disputed question of

intent, and such a question is not proper summary-judgment fodder.  For goodness sakes, the

parties don't even agree about which K-State booklet plaintiff used to draft the handwritten

document.  At summary judgment, the court "cannot weigh the evidence or make credibility

determinations."  *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023).

    The court thus declines to decide on summary judgment whether the parties' agreement

included the handwritten document.  The court next considers the parties' various disputes about

breach.

## 2.    Breach

    It's undisputed that defendants have breached the contract; they failed to pay plaintiff.

Defendants insist that they didn't have to pay because plaintiff materially breached the

agreement.

    Under Kansas law, a "party is not liable for a material failure of performance if it can

show that the other party committed a prior material breach of the contract; in such event, the

prior breach discharged the party's own duty to perform."  *Hawley v. Shear*, No. 20-2562-EFM,

2023 WL 2784838, at *4 (D. Kan. Apr. 5, 2023) (quotation cleaned up).  "A material breach is

one in which 'the promisee receives something substantially less or different from that for which

he bargained.'"  *Id.* (quoting *Almena State Bank v. Enfield*, 954 P.2d 724, 727 (Kan. Ct. App.

1998)).  "Substantial performance is the antithesis of material breach."  *Almena State Bank*, 954

P.2d at 727 (quotation cleaned up).  So, the court must determine whether plaintiff materially

breached the contract or substantially performed it.

    Defendants' breach-of-contract counterclaim involves two contracts:  the sharecrop

agreement and the custom-farming agreement.  Defendants allege plaintiff breached the

30

sharecrop agreement by: (i) failing to follow the CPI Precision Agriculture Program, (ii) overcharging for inputs, (iii) underreporting crop yields and failing to deliver all crops to grain elevators for weighing and accounting. Doc. 75 at 16 (PTO ¶ 4.b.). Defendants further allege the same breaches of the custom-farming agreement, plus one more: overcharging for services.

The court begins its analysis with the CPI Precision Agriculture issue, then considers all the controversy about invoices together, and concludes with the grain-delivery debacle.

### a.    The CPI Precision Agriculture Program

Defendants argue that plaintiff breached the sharecrop and the custom-farming agreements by failing to follow CPI's Precision Agriculture Program on their fields.

Plaintiff emphasizes that the parties never agreed to use CPI. Doc. 85 at 28. And there is some support for this position in the summary-judgment record. Defendant Jacob testified that the parties didn't agree to any specific terms, Doc. 79-3 at 18 (J. Timmer Dep. 170:3–5), and he admitted that he never complained to plaintiff about the CPI program, Doc. 85-6 at 9 (J. Timmer Dep. 168:6–22). Defendant Stacy knew nothing about CPI's data tracking until late 2023. Doc. 85-5 at 11 (S. Timmer Dep. 201:18–202:1).

Instead of a specific agreement about CPI, it's undisputed that the parties simply agreed plaintiff would farm defendants' land in the same manner he farmed his own. Doc. 85 at 28. Plaintiff insists he did so, or, at worst, that he substantially did so. *Id.* Defendants, of course, disagree. They assert that plaintiff agreed to follow CPI's fertilizer prescriptions, but, in 2023, he applied less fertilizer than CPI prescribed. Doc. 77 at 32. Defendants cite three instances of plaintiff failing to follow CPI fertilizer prescriptions.

*First*, defendants assert that plaintiff admitted he hadn't applied any fertilizer to one-third of defendants' field. *Id.* But plaintiff's deposition testimony that defendants cite for this proposition, as mentioned above, doesn't support this view:

Doc. 77-13 at 27 (Pl. Dep. 181:1–5).  No reasonable factfinder could see this exchange and conclude plaintiff testified that he didn't apply fertilizer to a field.  He testified about reading an (unknown) map.  He didn't testify about what he actually did.  And he went on to testify that he did, indeed, apply fertilizer to the field.  *See id.* (Pl. Dep. 181:5–20).  The summary-judgment evidence thus doesn't support defendants' claim that plaintiff didn't apply fertilizer to part of a field and plaintiff deserves summary judgment against this theory of breach.

*Second*, defendants argue that plaintiff breached their agreement by applying lower amounts of fertilizer than CPI prescribed.  Doc. 77 at 32.  They claim this contradicted the parties' agreement.  But this mischaracterizes the parties' agreement.  The parties didn't agree that plaintiff would apply CPI's fertilizer prescriptions—how could they when (as defendants concede) they never discussed specifics?  Instead, the parties agree that plaintiff would farm defendants' fields like he farmed his own.  And the summary-judgment facts show that plaintiff did so.

Defendants' theory relies heavily on Hohner's testimony about under-application of fertilizer.  *See* Doc. 77 at 8–9.  Hohner, plaintiff's farmhand, testified that plaintiff didn't follow the CPI prescription if the prescription called for a really high rate of fertilizer.  Doc. 77-21 at 5 (Hohner Dep. 41:3–20).  And yet Hohner never testified that plaintiff didn't follow the CPI prescription just on defendants' fields.  To the contrary, Hohner testified he wasn't sure if plaintiff had adjusted fertilizer prescriptions on defendants' land.  *Id.* at 10 (Hohner Dep. 103:15–21).  He testified he didn't know how often plaintiff applied less, only that the plaintiff,

32

his father, or his son would "*always* go less, just to make it a little cheaper because it was calling for an extreme amount." *Id.* (Hohner Dep. 103:22–104:10) (emphasis added). In sum, Hohner's testimony about fertilizer can't provide a basis for a reasonable factfinder to find that plaintiff farmed defendants' land differently than he farmed his own. Plaintiff has earned summary judgment against this breach-of-contract theory.

*Last*, plaintiff admitted that he reduced the CPI fertilizer prescription by about 50% on one field in October 2023. Doc. 77-13 at 27 (Pl. Dep. 181:6–182:21). He testified that he did so on just one field because it "was getting late into the season, in October, and [I] hadn't gotten paid for anything[.]" *Id.* Plaintiff explained that, if the fertilizer was cheap, he might have applied the full prescription, but he "turn[ed] it down to get it close to 50 pounds per acre." *Id.* This, plaintiff admits, is the one exception to plaintiff farming defendants' land as he farmed his own. Doc. 85 at 31. Plaintiff maintains that this adjustment was reasonable and justified because defendants had breached the contract by failing to pay. *Id.* at 31–32. The court can't resolve this third issue at summary judgment. Here's why: a timing problem.

Under Kansas law, when "a party materially breaches a contract, they are precluded from enforcing the contract against the nonbreaching party until the material breach has been cured." *Alenco, Inc. v. Warrington*, 560 P.3d 586, 596 (Kan. Ct. App. 2024); *see also Fed. Land Bank of Wichita v. Krug*, 856 P.2d 111, 115 (Kan. 1993) (explaining that material breach of contract warrants "rescission of a contract"). It's not "summary-judgment clear" who breached the parties' contract first. A reasonable factfinder could conclude that the handwritten document was part of the parties' agreement and plaintiff thus breached the agreement first by charging rates higher than those on the handwritten document. But a reasonable factfinder also could conclude that the handwritten document was *not* part of the parties' agreement, and thus

reasonably conclude that defendants breached the contract first by failing to pay plaintiff for his work.

Plaintiff insists that, even in this latter scenario, he hasn't breached the agreement materially because he substantially performed his contractual obligations and charged a reasonable (if higher) rate for his services. But a reasonable factfinder could conclude that plaintiff materially breached the contract first by charging rates higher than those listed on the handwritten document. So, a reasonable factfinder could conclude that plaintiff couldn't justify reducing the fertilizer he applied to defendants' fields until he had cured his original breach.

In sum, only one part of defendants' breach-of-contract counterclaim for failing to follow CPI Precision Agriculture on their fields survives: plaintiff's failure to apply the full amount of fertilizer on one field in October 2023. The court takes up defendants' second theory of breach, overcharging for inputs and services, next.

### b.    Overcharging

Defendants also assert that plaintiff breached the sharecropping agreement by overcharging for inputs. Doc. 75 at 16 (PTO ¶ 4.b.). And they assert that plaintiff breached the custom-farming agreement by overcharging for inputs and his own services. *Id.* The court tackles these accusations by first addressing the invoices from 2022, then the invoices from 2023.

### i.    The 2022 Invoices

In the Pretrial Order, defendants claim that plaintiff overcharged them in 2022 to the tune of $23,183.24. *Id.* at 19. Plaintiff has moved for summary judgment on defendants' counterclaims and controverted each claim of overcharge on the 2022 invoices. The court examines each overcharge presented in the Pretrial Order, below.

First, defendants claim that plaintiff overcharged them $3,606.68 for spraying 503 acres of wheat stubble because plaintiff only sprayed 354 acres, creating an extra charge for 154 acres. *Id.* at 18.  Plaintiff explained that he sprayed 354 acres and charged for 508 acres because he had to spray the entire 354-acre field twice, and had to spray 154 acres a third time.  Doc. 79-1 at 5 (Pl. Aff. ¶ 26.a.).  Plaintiff didn't charge defendants for the second spray; he only charged them for the third spray.  *Id.*  He thus claims that he ultimately *undercharged* defendants.  *Id.* Defendants quibble that no 154-acre field exists.  Doc. 86-8 at 1 (S. Timmer Decl. ¶ 11). Defendants have missed the point.  Plaintiff charged for the actual acres he treated.  Doc. 92-1 at 2 (2nd Supp. Pl. Aff. ¶ 6).  So, it doesn't matter if the acreage treated matches the size of a field. No reasonable factfinder could buy defendants' attempt to cast doubt on plaintiff's explanation. The court thus concludes that plaintiff is entitled to summary judgment against defendants' claim of overcharging wheat-stubble spraying by 154 acres.

Next, defendants claim plaintiff overcharged $3,300.01 for 101.23 acres of spraying beans because the acreage doesn't match the size of either field planted to beans.  Doc. 75 at 18. Plaintiff explains that he had to spray 101.23 acres for a second time due to drought conditions. Doc. 79-1 at 5 (Pl. Aff. ¶ 26.b.).  Again, plaintiff didn't charge for the size of the field; he charged for the acres he treated.  Yet, again, defendants insist plaintiff overcharged them because no 101-acre bean field exists.  Doc. 86-8 at 2 (S. Timmer. Decl. ¶ 12).  But that doesn't controvert plaintiff's explanation for the charge.  No reasonable factfinder could find an overcharge here.  The court concludes that plaintiff is entitled to summary judgment against defendants' claimed overcharge of spraying 101.23 acres.

Defendants then claim damages for plaintiff's double-billing of corn preplant chemicals. Doc. 75 at 18.  Plaintiff asserts that no such double-billing occurred because defendant Stacy

approved this spraying. Doc. 79-1 at 5 (Pl. Aff. ¶ 26.c.). Stacy disputes this assertion and claims she never authorized it. Doc. 86-8 at 2 (S. Timmer Decl. ¶ 13). So, a dispute of material fact of Stacy's authorization for the corn preplant chemicals exists, and this overcharge remains live for trial.

The remaining four damages claims in the Pretrial Order boil down to a dispute over the rates plaintiff charged for his custom-farming services.[20] Doc. 75 at 19. That is, defendants assert that plaintiff charged a rate higher than the rate on the handwritten document. As discussed, a genuine dispute of material fact exists whether the handwritten document qualified as part of the parties' agreement. That dispute prevents the court from deciding the fate of these alleged overcharges at summary judgment. That resolves plaintiff's arguments about the 2022 invoices, so the court moves on to defendants' motion.

In their own motion for summary judgment, defendants raise a much narrower set of invoices. Defendants assert the following overcharges from the 2022 invoices:

- Invoice No. 310324 overcharged $525.50 for spraying corn where plaintiff charged $7 per acre despite agreement on $6.50 per acre, Doc. 77 at 16–17;

- Invoice No. 310324 overcharged $215 for drilling oats where plaintiff charged $22 per acre despite agreement on $17 per acre, *id.* at 17;

- Invoice No. 310324 overcharged $21.50 for spraying oats where plaintiff charged $7 per acre despite agreement on $6.50 per acre, *id.*;

- Invoice No. 310326 overcharged $3,957.11 for planting beans where plaintiff charged $41.75 per acre despite agreement for $17.50 per acre, *id.* at 18;

- Invoice No. 310333 overcharged $745.20 for planting cover crops where plaintiff charged $22.50 per acre despite agreement on $17.10 per acre, *id.* at 18–19;

---

[20] Plaintiff takes issue with a damages claim for planting billed at $41.75 per acre when defendants claim that plaintiff agreed to $17.50 per acre. Doc. 79 at 12 (citing Doc. 75 at 19). Plaintiff explains that he billed the planting at $22/acre and added $19.75/acre for starter fertilizer. Doc. 79-1 at 5–6 (Pl. Aff. ¶ 26.e.). Stacy asserts, however, that plaintiff charged for the starter fertilizer elsewhere. Doc. 86-8 at 2 (S. Timmer Decl. ¶ 15). So, a dispute of material fact prevents the court from granting plaintiff summary judgment on this issue.

- Invoice No. 310333 overcharged $938.40 for cover-crop seed where plaintiff charged $32.60 per acre despite agreement on $28.00 per acre, *id.* at 19.

Plaintiff moves to strike the first bullet point's claim—$525.50 overcharged for spraying corn in Invoice No. 310324—because that overcharge doesn't appear anywhere in the Pretrial Order. Doc. 85 at 17. He's right. The Pretrial Order section defendants cite claims damages for double-billing corn preplant chemicals, not for overcharging for spraying corn. Doc. 75 at 18. Defendants thus have waived this damages claim. *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]heories of damages not included in the pretrial order are waived[.]").

The rest of the bullet points come down to a dispute about plaintiff's custom-service rates and whether the parties' agreement included the rates on the handwritten document.[21] The dispute swirling around plaintiff's custom-farming rates on the handwritten document prevents the court from concluding that, as a matter of law, defendants are entitled to recover for these overcharges.

In sum, a genuine dispute of material fact remains for the following theories of plaintiff overcharging defendants in 2022: (i) plaintiff double billing for corn replant chemicals and (ii) plaintiff overcharging for his services—but only those overcharges captured in the Pretrial

---

[21]    As mentioned above, the dispute about the starter-fertilizer charge in Invoice 310326 presents a dispute of material fact because Stacy has testified that plaintiff charged for starter fertilizer elsewhere. The court also notes that plaintiff complains that the defendants' summary-judgment argument about Invoice No. 31033 differs from the damages claimed in the Pretrial Order. Doc. 85 at 17. That's true; they do differ. But only just. The Pretrial Order claims an overcharge for three things: planting, seed, and fertilizer. Doc. 75 at 19. And it claims an overcharge on 136.46 acres. *Id.* In contrast, in their summary-judgment motion, defendants only claim an overcharge for planting and seed. Doc. 77 at 18–19 (DSOF ¶¶ 133–41). The motion also bases the planting overcharge on 138 acres, slightly more than the 136.46 mentioned in the Pretrial Order. *Id.* at 18 (DSOF ¶ 133). The court declines to do anything about these small differences because plaintiff doesn't ask the court to do so and "pretrial orders generally should be construed liberally[.]" *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000).

Order.  With the 2022 invoices whittled down as summary-judgment principles will permit, the court next considers the 2023 invoices.

### ii.    The 2023 Invoices

Defendants also claim that plaintiff breached the custom-farming agreement by overcharging them for custom-farming services in 2023.  Doc. 77 at 20–23.  As already covered, a genuine dispute of material facts exists whether the parties adopted into their oral contract the custom-farming rates on plaintiff's handwritten document.  The court can't grant summary judgment on this breach-of-contract theory.

Defendants have another breach-of-contract theory based on the 2023 invoices.  They assert that plaintiff breached the sharecropping agreement by overcharging them for inputs—*i.e.*, by marking up his fertilizer costs.  It's uncontroverted that plaintiff advanced some money for the input costs.  He counts $143,962.00 for fertilizer, chemical, and seed advanced costs.  Doc. 79-1 at 7 (Pl. Aff. ¶ 32).  And it's uncontroverted that plaintiff, under the parties' agreement, wasn't supposed to markup prices for his inputs.  Doc. 77-13 at 24 (Pl. Dep. 155:12–19); Doc. 79-2 at 24 (S. Timmer Dep. 161:20–162:3).  After plaintiff submitted his initial invoices, defendants questioned his fertilizer prices.  Doc. 79-1 at 7 (Pl. Aff. ¶ 33).  These invoices had incorrect prices for fertilizer and chemicals.  Doc. 77-13 at 27 (Pl. Dep. 183:20–22).  So, plaintiff revised the invoices.[22]

Plaintiff based his fertilizer prices on the fertilizer bills he got from CPI.  On plaintiff's fertilizer bills, CPI charged plaintiff $0.24750 per pound for 32% nitrogen fertilizer.  Doc. 77-26

---

[22]    Plaintiff attached the relevant invoices to the Pretrial Order as Exhibit A.  *See* Doc. 75-1.
Defendants argue that the fertilizer and chemical prices on these Exhibit A invoices are incorrect.  Doc.
77 at 21 (DSOF ¶ 157).  Defendants are mistaken.  In the testimony defendants cite, plaintiff testifies that
the *original* invoices had incorrect fertilizer and chemical prices.  Doc. 77-13 at 27, 28 (Pl. Dep. 183:20–
22, 185:15–21).  Exhibit A contains *revised* invoices.  *Compare* Doc. 77-12 (Corrected Invoices), *with*
Doc. 75-1 (PTO Ex. A).  The court is unimpressed with defendants' mischaracterization of the record.

at 4 (Ragsdale–000163). When plaintiff charged defendants for nitrogen fertilizer, he billed per *gallon*. *See* Doc. 75-1 at 1–4 (PTO Ex. A). Defendants assert that a gallon of fertilizer weighs 11.06 pounds. Doc. 77 at 20 (DSOF ¶ 149). Defendants convert plaintiff's price per gallon to price per pound and came up with $0.264 per pound—higher than the $0.24750 that CPI charged plaintiff. *Id.* (DSOF ¶ 150). Defendants thus conclude that plaintiff marked up his fertilizer costs.

Not so. The summary-judgment record plainly contradicts defendants' story about the fertilizer invoices. As plaintiff points out, his fertilizer costs encompassed more than the cost of the 32% fertilizer. Doc. 85 at 18. CPI also billed him for a fertilizer called "Thio-Sul" and charged an insurance fee:

| No. | Date | Description | Quantity | Price | Ext. Price | Inv. Total | Payments | Balance |
|-----|------|-------------|----------|-------|-----------|-----------|----------|---------|
| 104820 | 03/10/23 | | | | | 13,322.50 | | |
| | | Franklin - 1547 13252 JM8LOZ | 13,043.5930 LBS | 0.00000 | 0.00 | | | |
| | | 12-0-0-26% THIO-SUL | 6,252.4000 LBS ✓ | 0.22250 | 1,391.16 | | | |
| | | 32-0-0 | 46,164.3000 LBS | 0.25750 | 11,887.31 | | | |
| | | DTF LIQUID FERTILIZER - NO SERVICE CHARGE | 52,416.7000 LBS | 0.00000 | 0.00 | | | |
| | | KANSAS FERTILIZER INS FEE | 52,417.0000 LBS | 0.00084 | 44.03 | | | 13,322.50 |
| | | FIELD ID | Feedlot Liquid DTF Site | | | | | |
| | | PRINT COMMENT 1 | 100% Robert E. Ragsdale | | | | | |
| | | PRINT COMMENT 2 | Thank you! | | | | | |
| | | FARM | POIs | | | | | |
| | | DEL ANALYSIS | 15522.9-0-0-S=1625.62 | | | | | |
| 104821 | 03/10/23 | | | | | 13,226.56 | | |
| | | Franklin - 1547 13298 N8S587 | 12,941.2470 LBS | 0.00000 | 0.00 | | | |
| | | 12-0-0-26% THIO-SUL | 5,948.8000 LBS ✓ | 0.22250 | 1,323.61 | | | |
| | | 32-0-0 | 46,055.4000 LBS | 0.25750 | 11,859.27 | | | |
| | | DTF LIQUID FERTILIZER - NO SERVICE CHARGE | 52,004.2000 LBS | 0.00000 | 0.00 | | | |
| | | KANSAS FERTILIZER INS FEE | 52,004.0000 LBS | 0.00084 | 43.68 | | | 26,549.06 |
| | | FIELD ID | Feedlot Liquid DTF Site | | | | | |
| | | PRINT COMMENT 1 | 100% Robert E. Ragsdale | | | | | |
| | | PRINT COMMENT 2 | Thank you! | | | | | |
| | | FARM | POIs | | | | | |
| | | DEL ANALYSIS | 15451.6-0-0-S=1546.69 | | | | | |
| 104822 | 03/10/23 | | | | | 13,230.06 | | |
| | | Franklin - 1553 13325 JY1UR4 | 12,945.2560 LBS | 0.00000 | 0.00 | | | |
| | | 12-0-0-26% THIO-SUL | 5,967.8000 LBS ✓ | 0.22250 | 1,327.84 | | | |
| | | 32-0-0 | 46,052.5000 LBS | 0.25750 | 11,858.52 | | | |
| | | DTF LIQUID FERTILIZER - NO SERVICE CHARGE | 52,020.3000 LBS | 0.00000 | 0.00 | | | |
| | | KANSAS FERTILIZER INS FEE | 52,020.0000 LBS | 0.00084 | 43.70 | | | 39,779.12 |
| | | FIELD ID | Feedlot Liquid DTF Site | | | | | |
| | | PRINT COMMENT 1 | 100% Robert E. Ragsdale | | | | | |
| | | PRINT COMMENT 2 | Thank you! | | | | | |
| | | FARM | POIs | | | | | |
| | | DEL ANALYSIS | 15452.9-0-0-S=1551.63 | | | | | |

**EXHIBIT 55** (R86JD 000451-000)

Doc. 77-26 at 1 (Ragsdale–00157). Taking the first entry as example, the invoice itself demonstrates that plaintiff didn't just pay $11,887.31 for the 32% fertilizer (identified as 32-0-0 in the invoice). *Id.* Rather, he paid $13,322.50 for 52,416.7 pounds of fertilizer—the 32% fertilizer, plus the Thio-Sul, plus the insurance fee. *Id.* When converted to gallons, this amount

comes to $2.81 per gallon, or $0.2541 per pound.[23]  Defendants simply have used the wrong

numbers by focusing solely on the cost of 32% fertilizer only.[24]

In sum, just one piece of defendants' breach-of-contract counterclaim based on the 2023

invoices survives summary judgment:  whether plaintiff overcharged defendants for his custom-

farming services.  No reasonable factfinder could conclude that plaintiff overcharged defendants

for fertilizer.  This conclusion resolves the parties' disputes about plaintiff overcharging.  The

court moves on to defendants' final theory of breach:  that plaintiff hauled grain somewhere

other than a grain elevator.

### c.      Hauling Grain

Defendants next assert that plaintiff breached the sharecropping and custom-farming

agreements by failing to deliver all crops from their fields to grain elevators.  Doc. 75 at 16 (PTO

¶ 4.b.).  Defendants also maintain that, in so doing, plaintiff underreported crop yields and failed

---

[23]      Indeed, some of plaintiff's invoices charge $2.81 per gallon.  *See, e.g.*, Doc. 75-1 at 1 (PTO Ex. A).  Plaintiff's custom-farming invoices are undated, *see generally id.*, which makes it difficult to match the invoices he sent defendants with the fertilizer invoices.  The court need not do so, however, because the invoices themselves demonstrate the error of defendants' view.  That is, the uncontroverted summary-judgment facts demonstrate that defendants' theory of fertilizer upcharge is wrong and no reasonable factfinder could agree with it.

The court shows its math here, using defendants' conversion rate of 11.06 pounds per one gallon of 32% fertilizer:

$$52{,}417 \; lbs. \; \times \; {1 \, gal.}/{11.06 \, lbs.} \; = 4{,}739.33 \; gal.$$

$$\$13{,}322.50 \; \div \; 4{,}739.33 \; gal. = \$2.81/gal.$$

$$\$2.81/gal. \; \times \; {1 \, gal.}/{11.06 \, lbs} \; = \$0.254/lb.$$

[24]      Defendants correctly note that plaintiff failed to controvert some of their statements of fact on this issue.  *See* Doc. 85 at 18–19 (failing to mention DSOF ¶¶ 148–52).  One of those facts asserts that plaintiff marked up the price of fertilizer.  Doc. 77 at 20 (DSOF ¶ 152).  The court declines to fault plaintiff for this oversight because plaintiff has controverted these facts sufficiently when addressing other facts.  Doc. 85 at 18–19 (Pl. Resp. to DSOF ¶¶ 144–47).

to account for some of defendants' crops.  *Id.*  The court begins with the question whether the parties' agreement required plaintiff to take all crops to the grain elevator.

It's undisputed that plaintiff hauled some of defendants' crops to his grain bins. Nonetheless, plaintiff is entitled to summary judgment on defendants' theory that he breached the parties' agreements by hauling crops somewhere other than the grain elevator.  The parties' oral agreement didn't include any requirement to haul grain to the elevator.

Defendant Stacy has submitted a declaration asserting that defendants didn't give plaintiff permission to take harvested crops anywhere other than a grain elevator.  Doc. 77-14 at 2 (S. Timmer. Decl. ¶ 8).  But her isolated grant of permission doesn't matter.  As recounted above, the parties never discussed the specifics of the custom-farming arrangement.  Indeed, Stacy testified at her deposition that she never directed plaintiff where to deliver grain.  Doc. 79-2 at 28 (S. Timmer Dep. 190:17–23).  She also testified that, before contacting plaintiff in November 2023—after plaintiff had finished harvesting—she never had personally told plaintiff where to deliver crops.  Doc. 85-5 at 9 (S. Timmer Dep. 131:21–24).  And defendant Jacob testified that he and plaintiff had just a "friend conversation" and didn't have a business conversation.  Doc. 79-3 at 20 (J. Timmer Dep. 177:16–25).  Defendants point out that plaintiff's father testified that none of defendants' grain should've gone to the bins.  Doc. 77-22 at 2 (R. Ragsdale Dep. 58:6–19).  But plaintiff's father wasn't part of or a party to the parties' oral contract, so his beliefs on this issue don't matter.  The court thus agrees with plaintiff.  The parties' agreement didn't require exclusive elevator delivery.  Doc. 85 at 32.  It grants plaintiff summary judgment against defendants' theory that he breached their agreement by failing to deliver all crops to the elevator.

Defendants also insist that plaintiff breached their agreements by failing to deliver all of their grain. Putting it another way, defendants assert that some grain is missing. Plaintiff responds that he gave defendants all grain that they were owed. The court begins its analysis of this issue by analyzing defendants' theory that plaintiff sold their grain to the Scoular Company without their knowledge and hid their grain that way. It then takes up defendants' arguments that they're missing 2022 crops. And it concludes this discussion with defendants' arguments that some 2023 crops are missing.

### i.        The Scoular Company

Based on crop-insurance documents,[25] in 2022, plaintiff reported 10,300.7 bushels of corn delivered to the feedlot bins. Doc. 77-23 (2022 Rain & Hail Report). But, in early 2023, plaintiff sold 15,298.55 bushels of corn to the Scoular Company. Doc. 77-24. Plaintiff couldn't have harvested additional grain between the 2022 corn harvest and early 2023. So, defendants conclude, plaintiff sold 5,000 more bushels of corn than he had in storage to the Scoular Company. Yet plaintiff never told defendants that he'd sold their corn to the Scoular company, and defendants never received payment for any corn that plaintiff sold to the Scoular Company. Doc. 77-14 at 2 (S. Timmer Decl. ¶ 16). Based on this, defendants cry foul.

Plaintiff accounts things differently. Defendants' 10,300.7 figure, according to plaintiff, only counts feedlot deliveries reported to insurance. Doc. 85 at 14. Plaintiff suggests looking, instead, at his total 2022 corn production: 14,520.90 bushels. That figure comes from three places:

- 11,344.90 bushels of corn from plaintiff's land, Doc. 79-11 at 2 (Fowler Summary A);

---

[25]        Plaintiff reports what he's planted to his crop-insurance agent. Doc. 77-13 at 6 (Pl. Dep. 40:2–6). Plaintiff and defendants have different crop-insurance companies, but the proof-of-yield tickets for the entire production go to plaintiff's insurance agent. *Id.* at 39 (Pl. Dep. 270:1–10).

- 2,548.00 bushels on the land that plaintiff sharecropped with defendants, entitling plaintiff to 1,698.68 bushels of his own, Doc. 79-15 at 2 (Fowler Summary B).

- 2,216 bushels on the land that plaintiff sharecropped with Mark Kaiser, entitling plaintiff to 1,477.33 bushels of his own, Doc. 85-13 at 19 (Rain & Hail – 002927).[26]

So, in total, plaintiff had 14,520.91 bushels of corn to sell after the 2022 harvest.[27]

Recall that plaintiff sold 15,298.55 bushels of corn to the Scoular Company. Doc. 77-24. Plaintiff thus sold 777.65 more bushels in early 2023 than he harvested in 2022. Plaintiff explains this discrepancy two ways. First, plaintiff traded some of his 2022 soybeans to his father and, in exchange, received 1,200 bushels of his father's corn.[28] Doc. 85-1 at 5 (Supp. Pl. Aff. ¶ 11). Plaintiff did so because his father had a soybean forward contract that required additional soybeans. *Id.* Plaintiff's father confirmed this. Doc. 85-15 at 2 (R. Ragsdale Aff. ¶ 7). Plaintiff also explains that he had stored grain from previous years' harvests. Doc. 85-1 at 5 (Supp. Pl. Aff. ¶ 11).

---

[26]     This exhibit didn't reprint well, so it is missing names over its columns. Fortunately, the court could consult other examples to discern the titles of the columns. *See, e.g.*, Doc. 85-13 at 20 (Rain & Hail – 002928).

[27]     Plaintiff insists that the 14,520.91 figure doesn't include defendants' grain. Doc. 85-1 at 5 (Supp. Pl. Aff. ¶ 11). Defendants take issue with this assertion, contending that plaintiff's figure contradicts the sharecropping agreement, isn't supported by the record, and doesn't add up. Doc. 91 at 11. Defendants are wrong. As demonstrated in the bullet-point breakdown, plaintiff accounted for the sharecropping agreement and removed the requisite one-third share—he added only 1,698.68 bushels and 1,477.33 bushels to his total production. The court had no trouble locating the figures supporting plaintiff's math in the documents plaintiff cited. And the math is simple: $11{,}344.90 + 1{,}698.68 + 1{,}477.33 = 14{,}520.91$.

[28]     Defendants ask the court to discredit this explanation. They assert that plaintiff sold all of his 2022 soybeans to CPI, so he couldn't have had any soybeans left to trade with his father. Doc. 91 at 11–12. This isn't the gotcha moment that defendants think it is because plaintiff had crops leftover from earlier years. *See* Doc. 85-1 at 5 (Supp. Pl. Aff. ¶ 11). And there's no reason for a reasonable factfinder to find that defendants would understand plaintiff's crop yield, crop storage, and crop-sale contracts better than plaintiff himself.

In sum, the summary-judgment evidence shows that defendants' theory—that plaintiff's sale of corn to the Scoular Company reeks of malfeasance—is incorrect. Indeed, as the court demonstrates next, defendants got all of their corn from the 2022 harvest.

### ii.        2022 Corn

To support their theory of missing 2022 corn, defendants rely heavily on a "Proof of Yield" document from AgMark LLC, the company who operates the grain elevator at issue. *See* Doc. 86 at 20–21; *see also* Doc. 86-9 (Proof of Yield). That Proof of Yield document doesn't show any elevator tickets from corn delivered from the sharecropped fields in 2022. *See generally* Doc. 86-9 (Proof of Yield).[29] Defendants assert that plaintiff reported 2,548 bushels of corn to crop insurance but didn't deliver any of those bushels to the grain elevator. Doc. 86 at 21 (DSOF ¶ 34).

Plaintiff disputes defendants' version of the story. Plaintiff submitted a summary (Fowler Summary C) showing that the sharecrop land produced 2,548 bushels of corn in 2022. Doc. 79-15 at 2 (Fowler Summary C).[30] Fowler Summary C is based on crop-insurance data. *See* Doc. 79-16 (Fowler App. C). Defendants want grain-elevator data. And they complain that plaintiff never gave them any grain-elevator tickets for corn from the sharecropped fields in 2022. Doc. 86-8 at 1 (S. Timmer Decl. ¶ 10). Defendants also fault Fowler Summary C for failing to rely on any records from the grain elevator. Doc. 86 at 21.

---

[29]     In case the reader is interested in better understanding this Proof of Yield document, according to defendants, the relevant account for the sharecrop land is RAGSTOD3. Doc. 86 at 20 (DSOF ¶ 26); *see also* Doc. 92 at 4 (declining to controvert this fact).

[30]     Defendants cite the relevant field as 17-2S-1W. Doc. 86 at 20 (DSOF ¶ 28). That doesn't quite match the legal description in Fowler Summary C, which lists the field as 17-2S-16W. Doc. 79-15 at 2. The court assumes that defendants' brief contains a typo.

Plaintiff, for his part, faults defendants' analysis right from the start for focusing exclusively on deliveries to the grain elevator. Plaintiff explains that the Proof of Yield document reflects only grain deposits into a particular account. Doc. 92-1 at 1–2 (2nd Supp. Pl. Aff. ¶ 5). But proving yield requires more than grain deposits into a particular elevator. *Id.* This is so because farmers can store grain in many different places and keep some grain for use as seed. *Id.* Plaintiff calls the Proof of Yield more of a "grain deposit ledger" than an actual proof of yield. *Id.* So, defendants' myopic focus on tickets from one grain elevator misses the forest for considering just one kind of tree.

Plaintiff also points out that he sent the actual scale tickets to the crop-insurance company. *See* Doc. 85-11 at 7 (Heritage Proof of Loss). These tickets show 142,700 pounds of corn from the sharecrop fields.[31] *Id.* And, according to plaintiff, that's 2,548 bushels. Doc. 85-1 at 5 (Supp. Pl. Aff. ¶ 11). This means defendants' one-third share totals 849.40 bushels. Recall that plaintiff maintains that, while he didn't take all of the corn to the elevator, he transferred the proper amount of corn to defendants' account at the elevator. Indeed, elevator records reflect a transfer of 849.50 bushels of corn from plaintiff to defendant Jacob in October 2022. Doc. 85-12 at 2 (Trinity Records).

Defendants got their corn. Plaintiff has adduced undisputed facts demonstrating that defendants aren't missing any corn from the 2022 harvest. No reasonable factfinder could conclude otherwise.

### iii.      2022 Wheat

Defendants have a similar complaint about the 2022 wheat harvest. Fowler Summary C, based on crop-insurance data, reports 1,871.71 bushels of wheat harvested on defendants'

---

[31]     The court reaches this figure by adding up the net weight of the three tickets:  58,540 + 59,160 + 25,000 = 142,700.

sharecrop fields.  Doc. 79-15 at 2 (Fowler Summary C); *see also* Doc. 79-16 (Fowler App. C).
But the Proof of Yield from the elevator shows 920.71 bushels of wheat from the sharecrop
fields delivered to the elevator in 2022.  Doc. 86-9 at 4 (Proof of Yield).  So, again, defendants
take issue with the difference between what plaintiff reported to crop insurance and what he took
to the elevator.  Doc. 86 at 21.

Again, plaintiff faults defendants for focusing exclusively on deliveries to a single
elevator.  That's not the way to measure yield from a field, he asserts.  Plaintiff's explanation for
the 2022 wheat-harvest numbers shows the pitfalls of defendants' approach:  only 920.71 bushels
of the 1,871.71 total bushels produced went to the elevator because plaintiff retained 964 bushels
for seed wheat.  Doc. 92-4 at 1 (Adjuster's Special Report).  Because he self-stored these 964
bushels, he then transferred defendants' one-third share, 313.94 bushels, into Jacob's account at
the elevator in July 2022.  Doc. 85-12 at 2 (Trinity Records).  Lest any doubt remain, plaintiff
has adduced evidence that, in July 2022, Jacob sold his one-third share of the total 1,871.71
bushels:  621.77 bushels of wheat.  Doc. 92-5 (Wheat Purchase Settlement).

Defendants got their wheat.  No reasonable factfinder could agree with defendants'
theory that they are missing wheat from 2022.

### iv.        2023 Harvest Generally

Defendants next rouse suspicion about the 2023 crops.  Plaintiff asserts that defendants
received all the grain produced from the trust land and the sharecrop land in 2023.  Doc. 79-1 at
6 (Pl. Aff. ¶ 30).  Plaintiff also submitted the affidavit of a financial consultant, who asserts that
no variance existed between the bushels of wheat that plaintiff produced and harvested on the
sharecrop ground and the bushels of wheat delivered for the 2023 crop year.  Doc. 79-25 at 5
(Seymour Aff. ¶ 15).  The financial consultant didn't find any material, unexplained variances

and, instead, found that the information reported to insurance and the delivery scale tickets reconciled. *Id.* at 6 (Seymour Aff. ¶ 16).

Defendants strive to controvert plaintiff's financial consultant's accounting by asserting that the financial consultant admitted that crop-insurance reporting isn't accurate. Doc. 86 at 20. As avid footnote readers know already, the court rejects defendants' attempt to cast dispersions on this data. *See above* n.7. Defendants complain that the financial consultant didn't look at grain-elevator records. Yet again, defendants labor under a misapprehension. They believe that a term of their agreement required plaintiff to substantiate grain production with elevator tickets—and elevator tickets only. Their myopic focus on grain-elevator records is misplaced. Plaintiff provided the scale tickets to the crop-insurance company. Farmers haul crops to a lot of different places, and the crop-insurance data captures the crops stored in those various places. *See* Doc. 92-3 at 1 (Supp. Seymoure Aff. ¶ 3) (explaining that relevant crop-insurance form captures "total bushel production").

The court thus concludes that defendants have failed to controvert the financial consultant's conclusion about the 2023 data. No reasonable factfinder could conclude that defendants are missing 2023 grain. The court demonstrates this, below, by combing through the summary-judgment evidence about the 2023 corn harvest and the 2023 wheat harvest.

### v.    2023 Corn

General complaints about the 2023 data aside, defendants take issue with the 2023 corn numbers. Plaintiff submitted a summary of the 2023 sharecropping production (Fowler Summary E) that showed 8,714.89 bushels of corn produced. Doc. 79-19 at 2 (Fowler Summary E). Like the other summary, Fowler Summary E is based on crop-insurance data. Doc. 79-20 (Fowler App. E). The Proof of Yield from the elevator shows 3,267.15 bushels of corn delivered

48

to the elevator in 2023.  Doc. 86-9 at 4 (Proof of Yield).  Defendants complain that plaintiff

reported 8,714.89 bushels to crop insurance but didn't deliver those bushels to the grain elevator.

Plaintiff has adduced evidence to explain this discrepancy.  First, plaintiff has corrected

the total corn production for 2023.  According to plaintiff's financial consultant, the crop-

insurance agent made an error.  Doc. 79-25 at 5 (Seymour Aff. ¶ 14).  The agent recorded one

load at 15.4 bushels.  *Id.*  But 15.4 represents the moisture-content of the grain, not the bushels.

*Id.*  Instead, the scale ticket shows 1095.40 bushels.  *Id.*; *compare* Doc. 79-33 at 3 (Rain & Hail–

002335), *with id.* at 6 (Rain & Hail–002343).  So, the crop insurer understated the yield by 1,080

bushels, for a total 2023 corn yield on the sharecropping field of 9,794.89 bushels.  Doc. 79-32 at

3 (Seymour Summary E).  Of this amount, defendants were entitled to one third, or 3,264.96

bushels.

As just mentioned, according to the Proof of Yield document defendants rely on, the

elevator shows 3,267.15 bushels of corn delivered to the elevator in 2023.  Elevator records show

that all of this corn went to Jacob.  Doc. 92-6 at 2 (Ag Mark Delivery Sheet).  That's one-third of

the corrected, total 2023 corn yield of 9,794.89 bushels.

Defendants got their corn.  No reasonable factfinder could conclude otherwise.

### vi.        2023 Wheat

The final dispute about missing grain is for the 2023 wheat.  Fowler Summary E shows

4,348 bushels of wheat from the relevant field.  Doc. 79-19 at 2 (Fowler Summary E).  The Proof

of Yield that defendants rely on shows 3,510.81 bushels of sharecrop wheat delivered to the

elevator.  Doc. 86-9 at 4–5 (Proof of Yield).  Plaintiff explains the discrepancy this way:  he

reserved the rest for seed wheat.  Doc. 79-28 at 3 n.5 (Seymour Summary E); Doc. 79-29 at 4–5

(Seymor App. C).  Plaintiff had those 845 bushels of seed wheat treated and cleaned at a cost of

$2.50 per bushel, a charge he didn't apply to defendants.  Doc. 79-25 at 5–6 (Seymour Aff. ¶ 15).

And he planted the seed wheat in defendants' fields.  *Id.*  Defendants offer no record evidence to

controvert this explanation.

The summary-judgment evidence thus permits just one reasonable conclusion:

defendants got their wheat.

### vii.    Hauling Grain Summary

As demonstrated above, defendants started their argument about missing grain on the

wrong foot.  They assert that they only received grain actually delivered to the grain elevator.

But the summary-judgment evidence tells a different story.  Plaintiff either (i) credited Jacob's

account at the grain elevator with their one-third share of crops stored elsewhere or (ii) stored the

crop as seed and used that seed on defendants' fields.  No reasonable factfinder thus could

conclude that defendants are missing grain.  Plaintiff thus deserves summary judgment against

this breach-of-contract theory.

### 3.    Breach of Contract Summary

To sum up, defendants' breach-of-contract counterclaim took heavy summary-judgment

fire.  Starting with the existence of a contract, viewing the facts in a light most favorable to

defendants, a reasonable factfinder could conclude that the handwritten document represented

the parties' agreement about plaintiff's custom-services prices.  So, a reasonable factfinder could

conclude that plaintiff overcharged defendants for his services.  That dispute remains live for

trial.

Defendants' theory that plaintiff breached the agreement by failing to follow CPI's

Precision Agriculture Program survives albeit in reduced form.  The parties never agreed that

plaintiff would follow CPI's fertilizer prescriptions; they agreed merely that plaintiff would farm

his land as he farmed his own.  Defendants never established that plaintiff failed to apply

fertilizer to part of a field.  And the summary-judgment evidence showed that he applied less fertilizer than the CPI prescription in all fields, not just defendants' fields.  But a reasonable factfinder could conclude that plaintiff unjustifiably reduced the fertilizer by 50% on one field in October 2023.

Defendants' theory that plaintiff overcharged them has some battle wounds, too.  Plaintiff adduced uncontroverted facts explaining several charges on his 2022 invoices.  All that remains for trial based on the 2022 invoices is an alleged double billing for corn replant chemicals and plaintiff's charges for his custom-farming services.  Similarly, for the 2023 invoices, a genuine dispute remains about plaintiff's charges for his custom-farming services.  But no reasonable factfinder could agree with defendants' theory that plaintiff marked up the price of fertilizer on his invoices.

Defendants' final theory of breach about hauling grain didn't make it through summary judgment.  The parties' agreement didn't require plaintiff to take all crops to the grain elevator. Nor could a reasonable factfinder find that plaintiff failed to account for all of defendants' crops. Instead, the summary-judgment facts show that defendants got their grain.

With the dust settled on defendants' breach-of-contract counterclaim, the court now must address plaintiff's breach-of-contract claim.  The above summary-judgment analysis shows that plaintiff is entitled to summary judgment on several of defendants' theories and that plaintiff is entitled to *some* payment for his services.  But at this stage, genuine issues of material fact remain, and they prevent the court from deciding just how much plaintiff is owed.  Until the court can resolve the factual dispute whether the parties agreed to the custom-farming rates on the handwritten document, the court can't determine (i) who breached the contract first and (ii)

how much defendants owe plaintiff.[32]  And, because a genuine dispute of material fact remains

about the contract's terms—but not about the existence of a contract itself—plaintiff isn't

entitled to summary judgment on his alternative unjust-enrichment claim.  *See Pizza Mgmt., Inc.*

*v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1167 (D. Kan. 1990) ("Promissory estoppel is an

alternative theory of recovery to a breach of contract claim.  It is an equitable doctrine resorted to

for the enforcement of promises that are noncontractual and otherwise unenforceable.").

The court turns to defendants' breach-of-fiduciary-duty counterclaim, next.

## B.    Breach of Fiduciary Duty

Defendants bring a counterclaim for breach of fiduciary duty.  Doc. 75 at 16 (PTO

¶ 4.b.).  Plaintiff asks for summary judgment against this counterclaim because, he asserts, no

fiduciary relationship existed between the parties.  Doc. 79 at 26–28.

The Kansas Supreme Court has recognized two general types of fiduciary relationships:

"(1) those specifically created by contract . . . and (2) those implied in law due to the factual

situation surrounding the involved transactions and the relationship of the parties to each other

and to the questioned transactions."  *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (Kan.

1982).  Defendants assert that this case belongs to the second category.  This second category of

fiduciary relationships can prove "difficult to determine and must depend upon the facts in each

---

[32]    Plaintiff asserts that he's entitled to prejudgment interest on his liquidated damages—*i.e.* the
money he advanced for inputs.  Doc. 79 at 24.  Likely, he is.  Indeed, defendants don't dispute this claim
anywhere in their summary-judgment response.  *See generally* Doc. 86.  The court saves this issue for
another day, however.  Here's why.

Kan. Stat. Ann. § "16–201 provides for prejudgment interest on liquidated claims.  A claim
becomes liquidated when both the amount due and the date on which such amount is due are fixed and
certain or when the same become definitely ascertainable by mathematical computation."  *Hamilton v.
State Farm Fire & Cas. Co.*, 953 P.2d 1027, 1033 (Kan. 1998).  But a genuine dispute of material fact
remains whether plaintiff double billed for corn chemicals.  *See above* § III.A.2.b.i.  So, the amount
plaintiff is due isn't quite certain, and the court thus declines to decide the issue of prejudgment interest
now.

case." *Id.* Fortunately, the Kansas Supreme Court has provided broad principles for courts to consider when determining whether a fiduciary relationship existed.

A fiduciary (i) "imparts a position of peculiar confidence placed by one individual in another," (ii) has "a duty to act primarily for the benefit of another," and (iii) "is in a position to have and exercise, and does have and exercise influence over the other." *Id.* "A fiduciary relationship implies a condition of superiority of one of the parties over the other." *Id.* And a fiduciary generally receives charge of "the property, interest or authority of the other[.]" *Id.*

But the court can't use a fiduciary relationship to "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated." *Id.* at 1243. "Mere concert of action, without more, does not establish a fiduciary relationship." *Wolf v. Brungardt*, 524 P.2d 726, 736 (Kan. 1974) (quotation cleaned up). So, for example, an arm's length transaction for mutual profit doesn't create a fiduciary relationship. *Id.* Parties create a fiduciary relationship "only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence[.]" *Id.* (quotation cleaned up).

"Under Kansas law a party seeking to establish the existence of a fiduciary relationship must prove it by clear and convincing evidence." *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990). The court may never presume a fiduciary relationship. *Id.*

Defendants here have failed to adduce clear and convincing evidence from which a reasonable factfinder could find that plaintiff willingly and knowingly accepted the duties of a fiduciary. A sharecropping agreement doesn't automatically create a fiduciary relationship because generally, a lessor-lessee relationship does not create a fiduciary duty. *Dugan v. First Nat'l Bank in Wichita*, 606 P.2d 1009, 1016 (Kan. 1980). Nor does the custom-farming

agreement create one because "[s]imply providing services pursuant to an ordinary, commercial contract does not establish a fiduciary relationship." *PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1478, 1484 (D. Kan. 1996) (applying Kansas law). Indeed, defendants proffer no authority holding that a farmer owes a landowner any fiduciary duty.

The summary-judgment facts don't include many of the hallmarks of a fiduciary relationship. Plaintiff didn't occupy a position of peculiar confidence; sharecropping and custom-farming are common practices. Nor did plaintiff have a duty to act primarily for defendants' benefit. Under the sharecropping agreement, plaintiff got two thirds of the crop and defendants got one third—plaintiff thus acted primarily for his own benefit. And the custom-farming agreement was a mere services contract that didn't impose any special duties on plaintiff. Plaintiff didn't want to enter the custom-farming agreement at first; he asked to sharecrop the trust land instead of custom farming, but defendants declined. Doc. 79-1 at 3 (Pl. Aff. ¶ 14). So, plaintiff didn't occupy a position of excessive influence or superiority over defendants. After all, defendants were the landowners, with plenty of experience with sharecropping. And defendants were the ones who decided to expand their operation with the trust land, and they hired plaintiff to custom farm it over his hesitation.

To be sure, plaintiff had access to information that defendants didn't have. As defendants point out, plaintiff set crop yield goals, chose how much fertilizer to apply, decided when to harvest, and hauled crops to a destination of his choice. Doc. 86 at 35–36. But these roles and decisions don't "spring from an attitude of trust and confidence," because they are part and parcel of farming. *Wolf*, 524 P.2d at 736. Defendants emphasize that they gave plaintiff a power of attorney, but they conveniently omit that they did so only for their crop-insurance policies.

Doc. 77-1 at 1 (Crop Insurance Power of Attorney).  Crop insurance is also part and parcel of farming.

In sum, defendants have failed to shoulder their burden to adduce clear and convincing evidence from which a reasonable factfinder could conclude that the circumstances of their agreement imposed a fiduciary duty on plaintiff.  Defendants have failed to demonstrate that the parties' sharecropping and custom-farming arrangements were anything but arm's-length business transactions.  No court ever has found a fiduciary duty existed in a case like this one. The court declines here to become the first.

Before the court moves on, it must clean up one stray fiduciary-duty aside.  In their summary-judgment response, defendants assert that plaintiff's "fiduciary role extended to the Timmers' cows and pastures."  Doc. 86 at 39.  Defendants don't bother to explain how the facts and circumstances of plaintiff caring for defendants' cattle created a fiduciary relationship.  And they certainly haven't cited any legal authority for their conclusory proposition.  The court thus rejects defendants' theory that plaintiff somehow owed defendants a fiduciary duty because he cared for their cattle.

In sum, no rational trier of fact could find, on this summary-judgment record, clear and convincing evidence of a fiduciary relationship.  Plaintiff thus is entitled to summary judgment against defendants' breach-of-fiduciary-duty claim.

## C.    Fraud

Defendants' motion asks for summary judgment in their favor on their fraud claim, Doc. 76 at 1, but their brief mentions fraud just once, *see generally* Doc. 77.  Defendants' analysis doesn't dedicate any space to their fraud claim.  *Id.* at 31–38.  The court thus denies defendants' request for summary judgment on their fraud claim because they've made no more than a perfunctory argument.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019)

(explaining that parties waive arguments when "they are advanced . . . only in a perfunctory manner" (quotation cleaned up)).

Plaintiff in turn seeks summary judgment *against* defendants' fraud claim. Doc. 79 at 24–26. "[F]raud is never presumed and must be established by clear and convincing evidence." *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004). "The elements of an action for fraud include [i] an untrue statement of fact, [ii] known to be untrue by the party making it, [iii] made with the intent to deceive or with reckless disregard for the truth, [iv] upon which another party justifiably relies and acts to his or her detriment." *Id.* Plaintiff attacks the first and fourth elements. He argues that he made no representations to defendants and, even if he had, defendants couldn't have relied on them reasonably. Doc. 79 at 25–26.

Defendants again have little to say in response. They don't dedicate any of their summary-judgment response brief to their fraud claim. *See* Doc. 86 at 29–40. Defendants make some noise about misrepresentations, but they do so only when arguing their fiduciary-duty claim against plaintiff. *Id.* at 33–36. And nowhere do defendants meet plaintiff's targeted argument about reasonable reliance. *See id.* Because defendants' response to plaintiff's summary-judgment arguments about their fraud claim is perfunctory, the court grants plaintiff's request for summary judgment against this claim. It's not the court's assignment to conjure defendants' arguments for them. *See Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (explaining that the court "will not craft a party's arguments" for it).

In any event, plaintiff is correct that defendants have failed to adduce clear and convincing evidence from which a reasonable factfinder could conclude that plaintiff made material misrepresentations. In the Pretrial Order, defendants allege that plaintiff defrauded them by "inducing them to believe that" plaintiff:

- followed the CPI Precision Agriculture Program,

- properly charged for services and inputs,

- accurately reported crop yields, and

- delivered harvested crops to grain elevators.

Doc. 75 at 16 (PTO ¶ 4.b.).[33]  But the summary-judgment record establishes as uncontroverted this much:  Plaintiff never represented to defendants that he did these things.  No representation means no fraud.

At the risk of sounding repetitive, the parties had no more than general discussions about how plaintiff would farm defendants' land.  To be sure, the parties agree that plaintiff would farm defendants' land as he farmed his own.  But that's not specific enough.  *Edwards v. Phillips Petrol. Co.*, 360 P.2d 23, 26 (Kan. 1961) ("Misrepsentations in order to constitute actionable fraud . . . cannot ordinarily be predicated on unfulfilled promises or statements as to future events."); *Blankinship v. Porter*, 47 P.2d 72, 75 (Kan. 1935) ("There is authority drawing a distinction between a promise made without an intent to perform and a promise made with an affirmative intent not to perform, and holding that the former is insufficient and the latter requisite to constitute actionable fraud." (quotation cleaned up)).  That is precisely what defendants have tried to do here:  transform a breach-of-contract claim into a fraud claim.  The court rejects this unsupported attempt.

## D.    KCPA

Defendants also make a counterclaim under the Kansas Consumer Protection Act and claim that they are entitled to judgment as a matter of law this claim.  Doc. 75 at 16–17 (PTO ¶ 4.b.).  The KCPA prohibits "suppliers" from engaging "in any deceptive act or practice in

---

[33]    Defendants also claim plaintiff defrauded them by trespassing on their pastures.  Doc. 75 at 16 (PTO ¶ 4.b.).

connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). Plaintiff argues that he's entitled to summary judgment against this claim because he doesn't meet the KCPA's definition of a supplier. Doc. 79 at 28–30. As relevant here, the KCPA defines a supplier as any "person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." Kan. Stat. Ann. § 50-624(l).

For the custom-farming issues, plaintiff doesn't qualify as a supplier because custom farming didn't fall within his ordinary course of business. Plaintiff never had custom farmed before this arrangement with defendants. Doc. 79-1 at 3 (Pl. Aff. ¶ 13). That alone disqualifies plaintiff as a supplier; no reasonable factfinder could conclude that plaintiff's ordinary course of business involved custom farming.

For the sharecropping issues, plaintiff makes a slightly different argument. The KCPA concerns itself with consumer transactions, and it defines a consumer transaction as a "a sale, lease, assignment or other disposition for value of property or services within this state, . . . to a consumer[.]" Kan. Stat. Ann. § 50-624(c). Under the sharecropping agreement, defendants leased land to plaintiff. So, plaintiff argues, if anything, *plaintiff* is the consumer under the KCPA. He's right. The KCPA defines a supplier as the lessor. Kan. Stat. Ann. § 50-624(l) ("'Supplier' means . . . lessor[.]"); *see also Dealers Leasing, Inc. v. Allen*, 994 P.2d 651, 654 (Kan. Ct. App. 1999) (defining company that leased jukebox to consumer as the supplier). So, the KCPA doesn't apply to defendants' counterclaims based on the sharecropping agreement.[34]

---

[34]    Defendants' only response to plaintiff's argument that he's not a supplier fails to persuade. Defendants argue that plaintiff regularly "engaged in ground preparation, planting, fertilizer application, harvesting, and transportation" and is thus a supplier. Doc. 86 at 36 (quotation cleaned up). Defendants' point is neither here nor there. No one disputes that plaintiff is a farmer. Defendants haven't argued that a reasonable factfinder could conclude that plaintiff, "in the ordinary course of business, solicits, engages in or enforces consumer transactions[.]" Kan. Stat. Ann. § 50-624(l). And the court declines to construct defendants' arguments for them.

In sum, plaintiff is entitled to summary judgment against defendants' KCPA counterclaim.[35]

### E.    Trespass

Defendants' final counterclaim is a trespass claim.  Doc. 75 at 17 (PTO ¶ 4.b.).  "Under Kansas law, trespass is an intentional tort, and plaintiff must show the following elements:  (1) that foreign matter entered upon another's land; (2) that the entry was purposeful or substantially certain to occur; (3) that defendant intended the act which constituted the invasion of plaintiff's rights."  *Equity Asset Corp. v. B/E Aerospace, Inc.*, 388 F. Supp. 2d 1305, 1310 (D. Kan. 2005) (citing *United Proteins, Inc. v. Farmland Indus., Inc.*, 915 P.2d 80, 83–84 (Kan. 1996)).  This standard requires defendants to prove that plaintiff entered their land "without a privilege to do so created by the possessor's consent or otherwise."  *Riddle Quarries v. Thompson*, 279 P.2d 266, 269 (Kan. 1955).  Defendants' permission is a hotly contested factual dispute.

Plaintiff seeks to defeat defendants' trespass claim by relying on defendants' "false testimony" about their permission.  Doc. 79 at 32.  Recall that, on plaintiff's telling, defendants gave him permission to use the pastures during an early May 2023 phone call.  Doc. 77-13 at 31 (Pl. Dep. 197:3–19).  Also recall that defendants didn't recall this phone call at their depositions, Doc. 79-2 at 27 (S. Timmer Dep. 175:4–18); Doc. 79-3 at 23 (J. Timmer Dep. 225:17–226:25), but later produced phone records showing they'd called plaintiff in early May, *see above* n.16.

---

[35]    Plaintiff argues that defendants' KCPA claim is groundless, so the KCPA entitles him to his attorney's fees.  Doc. 75 at 17 (PTO ¶ 5.a.).  The cited provision in the KCPA entitles *suppliers* to recover attorney fees if a consumer brings a groundless case and the supplier prevails. Kan. Stat. Ann. § 50-634(e)(1).  But the court just concluded that plaintiff isn't a supplier.  So the court declines to award plaintiff his attorney's fees under this provision of the KCPA.  In light of this conclusion, the court declines to decide whether defendants' KCPA claims were groundless.  Doc. 76 at 2.

So, plaintiff has suspicions about defendants' credibility on this matter.  Defendants, for their part, have their own suspicions about plaintiff's credibility.[36]  But, at summary judgment, the court "cannot weigh the evidence or make credibility determinations."  *Forth*, 85 F.4th at 1052.  Defendants maintain that they didn't give plaintiff permission and, viewing the facts in the light most favorable to them and crediting these assertions, a reasonable factfinder could find for defendants.  Thus the court can't grant summary judgment in plaintiff's favor on the permission issue.

Perhaps anticipating an insurmountable problem created by the summary-judgment standard, plaintiff proffers another reason for summary judgment:  he was, at worst, a good-faith trespasser.  Doc. 79 at 32–33.  But this argument also relies on a factual premise incompatible with the summary-judgment standard.  Construing the facts in the light most favorable to defendants, plaintiff didn't have permission, and he knew it, because defendants never gave him permission.  So, under that summary-judgment version of the facts, he couldn't have acted in good faith.

Switching gears to trespass damages, defendants then ask the court to find, as a matter of law, that they responded reasonably after learning of plaintiff's trespass.  Doc. 76 at 2.  Plaintiff, predictably, argues that he's entitled to summary judgment against defendants' trespass damages because defendants acted *un*reasonably when they discovered the alleged trespass.  Plaintiff

---

[36]    Defendants base their suspicions on defendant Jacob's conversations with plaintiff about potential pasture land available for plaintiff's cattle.  Doc. 86 at 38.  On May 3, Jacob offered to help plaintiff find room for some cattle and suggested ground called the Trapper Mine.  Doc. 86-7 at 1 (5/3/2023 Texts).  Plaintiff claims that defendants gave him permission to use the pastures on May 12.  Four days later, plaintiff told Jacob that if the Trapper Mine lease option didn't come to pass, that was that, and he would sell the cattle.  *Id.* at 9 (5/16/23 Texts).  Defendants claim that this statement "is not the statement of a man who had just been told he could graze his cows on the Timmer and trust pastures in Kansas."  Doc. 86 at 2.

argues that defendants failed to mitigate their damages by choosing not to bring their cattle back to Kansas out of spite.  Doc. 79 at 33–34.

"A person suffering from the trespass of another is bound, as far as he reasonably can, to reduce his damages, and he is required to exercise the diligence of an ordinarily prudent man in order to do so."  *Mackey v. Bd. of Cnty. Comm'rs of Johnson Cnty.*, 341 P.2d 1050, 1058 (Kan. 1959) "[M]itigation of damages is an affirmative defense, the establishment of which devolves upon the party asserting it."  *Rockey v. Bacon*, 470 P.2d 804, 808 (Kan. 1970).

The court declines to decide, at summary judgment, whether defendants exercised reasonable care when mitigating their alleged trespass damages.  "Whether reasonable care was exercised is a question of fact, precluding the grant of summary judgment"—in either direction. *Honeycutt ex rel. Phillips v. City of Wichita*, 836 P.2d 1128, 1142 (Kan. 1992).  On one hand, a reasonable factfinder might agree with plaintiff, *i.e.*, Kansas ranchers don't graze their cattle on pastures over the winter, so plaintiff's trespass caused defendants no harm.  Or a reasonable factfinder also could find that defendants failed to use common sense by making no effort to locate alternative pasture or stalk grazing in Kansas.  On the other hand, a reasonable factfinder also could find that, because defendants had used their Kansas pastures over the winter in earlier years, they could've done so in 2023.  And, without those pastures as an option, defendants behaved reasonably by keeping their cattle close to home in Colorado.

In sum, neither side of the case's caption deserves summary judgment on the issue of defendants' trespass damages.

## IV.       Conclusion

The court denies defendants' Motion for Partial Summary Judgment (Doc. 76).  Genuine disputes of material fact prevent the court from granting defendants judgment as a matter of law

on the breach-of-contract counterclaim.  And their breach of fiduciary duty, fraud, and KCPA claims survive.

The court grants in part and denies in part plaintiff's Motion for Summary Judgment (Doc. 78).  Plaintiff has shown that no reasonable factfinder could agree with several of defendants' theories of breach.  But a genuine dispute of material fact prevents the court from granting him summary judgment on his breach-of-contract claim.  Plaintiff is entitled to summary judgment against defendants' counterclaims, as captured above.

The court concludes by tying up a few loose ends.  Plaintiff moves for summary judgment against defendants' counterclaim for an accounting, but never once mentions that claim in his brief.  *See generally* Doc. 79.  The court isn't sure what to do with defendants' accounting counterclaim, so the claim remains live.  The court also grants defendants' motions to seal exhibits containing plaintiff's financial information.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 76) is denied.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Summary Judgment (Doc. 78) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to Strike (Doc. 85) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Seal (Doc. 81) is granted. The court orders Doc. 82-1 sealed permanently.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Seal (Doc. 89) is granted. The court orders Doc. 87-1 sealed permanently.

**IT IS FURTHER ORDERED THAT** Doc. 91-1 is struck.

**IT IS SO ORDERED.**

**Dated this 27th day of February, 2026, at Kansas City, Kansas.**

                                    **s/ Daniel D. Crabtree**
                                    **Daniel D. Crabtree**
                                    **United States District Judge**