## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TODD RAGSDALE,**

        **Plaintiff/Counter Defendant,**

        **v.**

**STACY TIMMER & JACOB TIMMER,**

        **Defendants/Counter Claimants.**

**Case No. 24-1170-DDC**

## MEMORANDUM AND ORDER

Defendants Stacy and Jacob Timmer seek to exclude plaintiff's expert, David Kehler. Kehler has worked at Kansas State University and its Butler County extension office for more than 30 years as a farm analyst, agricultural director, and program coordinator. Doc. 97-1 at 3. Before working at K-State, he worked for almost 20 years at extension offices as a 4-H agent. He consults with a variety of professions about agriculture economics, using data—commodity prices, input prices, land prices, custom-farming rates, input requirements for crops and livestock, standardized loss and death rates, alternative income sources—"to craft business models for agricultural operations." *Id.*

Kehler opined about two topics in this case: pastureland and custom farming. Defendants, seemingly tossing pasta at the wall, challenge these opinions under every standard they can think of. But their flinging fails to persuade. The court, as explained below, denies

their motion to exclude Kehler.  The court assumes familiarity with the background facts of the

case and begins with the legal standard governing expert challenges.[1]

## I.        Legal Standard

Under Rule 702, the court bears a "gatekeeping obligation" to determine whether expert

testimony is admissible.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  When it performs this

gatekeeping role, the court has broad discretion.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496,

1499 (10th Cir. 1996).  And this case is set for a bench trial.  With a bench trial, "while

*Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony

reaching a jury obviously do not arise[.]"  *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769,

779 (10th Cir. 2009).  It broadens the trial court's already broad discretion.  *Id.*

Courts exercise this discretion under the standard adopted in Fed. R. Evid. 702, a rule

providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

Fed. R. Evid. 702.

---

[1]      The court recently detailed the dispute underlying this action.  *See* Doc. 96; *Ragsdale v. Timmer*,
No. 24-1170-DDC, 2026 WL 560347 (D. Kan. Feb. 27, 2026).

"Rule '702 requires the district court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Earls*, 129 F.4th 850, 862 (10th Cir. 2025) (quotation cleaned up) (quoting *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019) (per curiam)).  Courts perform the Rule 702 inquiry in two stages. *First*, the court must "'decide whether the proffered expert is qualified by knowledge, skill, experience, training, or education to render an opinion.'" *Id.* (quoting *Bill Barrett Corp.*, 918 F.3d at 770).  *Second*, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (citing *Nacchio*, 555 F.3d at 1241).  "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

## II.    Analysis

Kehler offered several opinions about defendants' pasture, ultimately opining that plaintiff's allegedly unsanctioned use of defendants' pastures didn't impair defendants' pasture in a material way.  Kehler also opined about average rates for custom-farming services and the average crop production in Phillips County.  And he asserted that, based on his observations, defendants' land is of standard quality, and nothing about defendants' land required a variation from the average rates for custom-farming services.

As already referenced, defendants challenge these opinions in every way they can.  In so doing, defendants seem to forget that they're arguing uphill.  Excluding experts is the exception, not the norm.  And this is a bench trial.  So, the usual *Daubert* concerns apply with less force.

3

With that background, the court begins its analysis with Kehler's pasture opinions, then considers his custom-farming opinions.

### A.    Pasture Opinions

Kehler offered seven opinions about the pasture. He first asserts that, in 2023, the range of pasture rental prices per acre in Phillips County was $12 to $28. Doc. 97-1 at 3. And the average was $18.85 per acre. *Id.* Second, Kehler asserts that, for plaintiff's use of defendants' pasture in 2023, "no more than the average Phillips County rental rate of $18.85" represents an appropriate rental rate. *Id.* Kehler explains that this is so because "the cattle were in the pastures approximately 30 days [fewer] than normal . . . and the stocking rate was less than normal[.]" *Id.* Third, Kehler opines about rental rates for plaintiff's pastures—the land used to pasture defendants' cattle. *Id.* For cattle on plaintiff's property, to cover yardage, care, and feed delivery, Kehler sets an appropriate rate of $1.25 per cow per day. *Id.* That $1.25 rate doesn't include the cost of hay. *Id.* For cattle on rented property, Kehler sets an appropriate rate between $0.25–$0.50 per day for services. *Id.* That rate doesn't include the cost of land, facility rental, or the cost of hay. *Id.*

Shifting gears, Kehler's fourth opinion provides the number of cattle that a rancher could run sustainably on pasture: one cow-calf pair per 10.5 acres. *Id.* at 4. In his fifth opinion, Kehler applies that average to defendants' pasture that plaintiff used. *Id.* He opines that defendants' pastures—assuming average pasture condition and 10.5 acres per cow-calf pair—could handle:

- Property 17-2-16 (189 acres):  18 plus 1 bull

- Property 19-2-16/ 24-2-17 (300 acres) = 28 plus 1 bull

- Property 32-2-16 (190 acres) = 18 plus 1 bull.

*Id.* In his sixth opinion, Kehler explains that this calculation typically would apply from May to November. *Id.*

Kehler's seventh and final opinion: whether the pasture usage just described would impair the pastures in the next year. *Id.* Kehler explains that, with "average pasture and weather conditions, pasture usage at the stocking rates set forth above should not have caused any material impairment to the" relevant pastures. *Id.* Kehler also rated the pastures based on an April 2025 site visit. *Id.* And Kehler compared defendants' pastures to another pasture and found defendants' "pastures were in substantially better condition than the comparison pasture." *Id.* So, in Kehler's view, "the assumed usage rates should not have caused any material impairment of the Timmers' pasture[.]" *Id.* at 5.

As just mentioned, defendants challenge these opinions with every argument they can muster. The court begins with their arguments about Kehler's qualifications, then considers their reliability arguments, and concludes with the relevance of Kehler's opinions.

### 1. Qualifications

Defendants first argue that Kehler lacks the qualifications to offer his pasture opinions. Doc. 97 at 4–5. Defendants demand that Kehler have experience calculating pasture rental rates, determining stocking rates for a pasture, and determining pasture condition. That's simply not what the governing law requires.

"Rule 702 is to be liberally construed in that it 'does not impose an overly rigorous requirement of expertise, recognizing that specialized knowledge may be acquired through a broad range of experience, skills or training.'" *Hansen v. SkyWest Airlines*, No. 13-CV-244-ABJ, 2015 WL 13402804, at *2 (D. Wyo. Sept. 23, 2015) (quoting *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1048 (D. Colo. 2011)). "The degree of 'knowledge, skill, experience, training, or education' sufficient to qualify an expert witness is only that necessary to

insure that the witness's testimony helps the trier of fact, as required by subdivision (a)."  29 *Wright & Miller's Federal Practice & Procedure* § 6264.1 (2d ed. 2026).

Kehler has a degree in animal science and industry.  Doc. 97-1 at 7.  He's served on various livestock-related boards and committees.  *Id.* at 7–8.  He's presented on livestock-grazing management at the Kansas Hay and Forage Conference.  *Id.* at 8.  And then there's Kehler's decades working in Kansas agriculture.  The court has no trouble finding that Kehler is qualified to offer expert opinions about the pastures at issue and the court rejects defendants' misguided argument.

This conclusion is a limited one.  It doesn't mean that the trier of fact will credit his opinions.  It merely means that the trier of fact should hear them.

### 2.    Reliability

Defendants assert that Kehler's opinions lack a reliable methodology.  Doc. 97 at 5–8. Defendants attack Kehler's reliability on several grounds.  The court considers each one, below, beginning with a brief explanation of reliability.

For experts in nonscientific topics, "the meaning of a 'reliable method' is unclear." *Atchison v. Jackson*, No. 21-cv-286-JDR-SH, 2026 WL 36454, at *4 (N.D. Okla. Jan. 6, 2026). "The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to nonscientific testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."  *Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13:CV-439 MCA/LF, 2017 WL 4410780, at *3 (D.N.M. Sept. 30, 2017) (quotation cleaned up).  Put simply, in "a non-scientific context, the reliability of an expert's methodology often will be a function of accepted practice in the area of expertise in question."  *Wright & Miller* § 6268.1.  "Rule 702 does not exclude witnesses from relying on

their experience when opining on an issue where that experience is relevant." *Atchison*, 2026 WL 36454, at *4.

Kehler bases his opinions about the pastures, in large part, on the K-State Research and Extension office's 2023 Phillips County Lease Summary. Doc. 97-1 at 9. Defendants complain about the methodology of this summary and its underlying summary. Doc. 97 at 6. In a separate affidavit, Kehler explains that the "rates reflected on this report would be the standard method for anyone in this industry in determining appropriate pasture lease rates for the applicable year." Doc. 79-62 at 4. If the summary's good enough for the industry, then it's "an accepted practice in the area of expertise in question." *Wright & Miller* § 6268.1. The court finds no reliability issues with Kehler's use of the Phillips County Lease Summary.

Defendants next target Kehler's views on the normal timeframe for cattle to graze on pasture, the appropriate stocking rate, and the number of cattle that a pasture can handle sustainably. Doc. 97 at 6. They argue that Kehler left his methodology unexplained and that Kehler's report lacks "industry standards" that "support this terminology." *Id.* Unlike defendants, the court doesn't struggle to understand Kehler's methodology. The Phillips County Lease Summary—which the court just found reliable—provides the typical grazing period: May 1 to November 1. Doc. 97-1 at 9. The Phillips County Lease Summary also provides the average stocking rate: 10.5 acres per cow-calf pair. *Id.* From the average stocking rate, simple math dictates how many cow-calf pairs sustainably can graze in a pasture. *Id.* In his supplemental affidavit, Kehler also verified that the "stocking rates reflected on the K-State Phillips County Lease Summary are consistent with my own research and recommendations that I use in the ordinary course and scope of my work[.]" Doc. 79-62 at 4.

7

Defendants also complain about Kehler's opinions about the pastures' condition. Doc. 97 at 6–8. Kehler viewed the pastures from the road in April 2025. Doc. 97-1 at 2. The court has no reliability concerns about Kehler—with nearly 50 years working in Kansas agriculture—drawing reliable conclusions from a visual inspection.

Defendants argue that Kehler didn't consider the 2023 drought conditions when he evaluated the pastures. Doc. 97 at 6. But the Phillips County Lease Summary is from 2023. Doc. 97-1 at 9. So that summary captures the pasture rental rates during drought conditions and a logical basis exists for Kehler's opinion. Perhaps Kehler could've included more about drought, but that's for cross-examination—not a reason to exclude his opinions. *See Fish v. Kobach*, 304 F. Supp. 3d 1027, 1041 (D. Kan. 2018) (explaining that when "a logical basis exists for the expert's opinion[,] the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony" (quotation cleaned up)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Left with nothing substantive to stand on, defendants resort to procedure. They ask the court to strike plaintiff's "references and arguments relying on the witness'[s] subsequent statements that are not part of his reports." Doc. 102 at 1. Defendants are complaining about plaintiff's citations to Kehler's affidavit. Kehler submitted the affidavit with plaintiff's summary-judgment reply—not with his expert reports. This procedure violates our rules, but nonetheless the court declines defendants' invitation to deploy procedural rules for their own sake. Here's why.

8

Rule 26(a)(2)(B)(i) requires that the parties' expert witnesses provide a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them[.]"  Rule 26(a)(2)(D) requires the parties to disclose their expert reports "at the times and in the sequence that the court orders."  And Rule 26(e)(1) imposes an ongoing duty for parties to supplement or correct an expert report if the expert report "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  But Rule 26(e)(1) "does not give [the parties] a right to disclose information in an untimely fashion." *Aid for Women v. Foulston*, No. 03-1353-JTM, 2005 WL 6964192, at *3 (D. Kan. July 14, 2005).  "A party may not utilize Rule 26(e)(1) to sandbag his opponent or to deepen or strengthen his case where the information should have been included in the expert report." *Id.* (quotation cleaned up).  If a party fails to comply with Rule 26, then Rule 37 applies.

Rule 37(c)(1) provides that if "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  A district court has "broad discretion" to determine "whether a Rule 26(a) violation is justified or harmless[.]" *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quotation cleaned up).  To determine whether a party's failure to comply with Rule 26 qualifies as justified or harmless, district courts apply the following four factors:  "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

9

Here, Kehler's efforts to support his expert report are untimely.  But the court finds them harmless.  Defendants' own conduct demonstrates the harmlessness.  Plaintiff attached Kehler's affidavit to their summary-judgment reply in July 2025— nearly nine months ago.  The affidavit didn't change any of Kehler's opinions.  So, this wasn't a disruptive disclosure on the eve of trial.  If defendants had a problem with Kehler's supplemental affidavit, they should've raised the issue nine months ago.  Given how much time has gone by since plaintiff submitted the affidavit, defendants have had plenty of time to cure any prejudice that this late disclosure caused them.  But apparently, they didn't need to cure anything; defendants never identify any prejudice that they've sustained from Kehler using an affidavit to *explain* his expert report—as opposed to *expand* it.  *See* Doc. 102 at 1–2.  The court declines defendants' invitation to enforce a procedural rule for the rule's own sake.

In sum, the court finds Kehler a reliable witness to testify about the pastures.

### 3.      Relevance

In their final challenge to Kehler's pasture opinions, defendants claim that the opinions lack relevance.  Doc. 97 at 8–9.  Defendants claim that Kehler's opinion that the pastures were in average condition when he visited in April 2025 are contrary to the views of defense witnesses, who viewed the pastures in May 2023 and decided that the pastures were in poor condition.  *Id.* The court begins with a brief discussion of the relevance legal standard.

Fed. R. Evid. 702(a) requires that an expert "help the trier of fact to understand the evidence or to determine a fact in issue[.]"  "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue[.]"  *Wright & Miller* § 6265.2.  "The most important factor in determining whether expert testimony will 'help' is the [factfinder's] need for expert testimony to accurately determine the facts."  *Id.*  So, "expert testimony helps where it clarifies esoteric matters beyond the ken of most lay people."  *Id.*  On the other hand, "expert opinion testimony

may not be helpful where there is other evidence or other means to put the [factfinder] in a position to accurately decide the facts." *Id.*

This is a bench trial. And the court is more than capable of deciding whether evidence is relevant. The court finds that Kehler's opinion about the pastures might help it determine what damages—if any—defendants suffered from plaintiff's alleged trespass. The existence of other evidence to the contrary doesn't make Kehler's opinion irrelevant. The same issue plagues defendants' argument that Kehler failed to address the replacement-cost damages for defendants' trespass counterclaim. Doc. 97 at 8. Regardless, it's bold of defendants to assume this measure of damages. The court hasn't determined the proper measure of damages yet (assuming defendants are entitled to trespass damages).

Defendants also complain that Kehler offered an opinion on causation. Doc. 97 at 9. It's not at all clear what this has to do with relevance. As best the court can tell, this is a reliability argument about Kehler's conclusion. The court just rejected defendants' reliability challenge. *See above* § II.A.2. And this conclusion flows logically from Kehler's opinions about the stocking rate, grazing duration, and the visual observation.

In sum, the court denies defendants' request to exclude Kehler's pasture opinions. The court considers Kehler's custom-farming opinions, next.

## B.      Custom-Farming Opinions

The court begins with a summary of Kehler's three opinions about crop production and custom farming. Kehler visited the farmland in April 2025—from the roadside. Doc. 97-2 at 2. The parties couldn't work out a time for him to visit because defendants insisted on being present for Kehler's visit. Doc. 99-1 at 1–2. For his first opinion, Kehler provides reasonable custom-farming rates, rates he based on the 2024 Kansas Custom Rates book published every two years by the Kansas Department of Agriculture and Kansas State University. Doc. 97-2 at 3. As

another source, he used the Kansas State Farm Management Budgets. *Id.* For his second opinion, Kehler provides county average crop productions for Phillips County in 2023. *Id.* at 6. And for his third opinion, Kehler opines that the land in question—based on his review—is of standard quality. *Id.* at 7. So, he opines, there's no need to vary from these standard custom-farming rates. *Id.*

Defendants attack these opinions on the same grounds as the pasture opinions: qualifications, reliability, and relevance.

### 1. Qualifications

On qualifications, defendants assert that nothing in Kehler's background "indicates that he has the pertinent knowledge, skill, experience, training, or education to render an expert opinion on the condition of the fields just from look at them from the road." Doc. 97 at 11. As demonstrated above, that's not the test for deciding whether Kehler is qualified. *See above* § II.A.1. And, in any event, defendants are the ones who made it difficult for Kehler to see the land by insisting that they were present for the inspection. Doc. 99-1 at 1–2.

Defendants also complain that Kehler isn't an agronomist with experience in soil analysis. Doc. 97 at 11. This nitpicking won't carry the day. Defendants wouldn't allow Kehler on the fields without them to take a soil sample. And farmers farmed for millennia without soil analysis. The court rejects defendants' argument that Kehler is unqualified to testify about reasonable rates and whether those rates should apply to the fields at issue here.

### 2. Reliability

Defendants next argue that Kehler's custom-farming opinions aren't reliable for a scattershot of reasons. *Id.* at 12–13. The court attempts to address all of their arguments, below. But, to spoil the ending, the court disagrees with defendants.

12

Defendants complain that Kehler didn't base his custom-farming-rate opinion on the handwritten document that plaintiff provided defendants listing various custom-farming rates. *Id.* at 9, 12.  Defendants ignore that the court could disagree with their position and conclude that those rates don't govern this case.  And, in any event, plaintiff asked Kehler to provide a reasonable custom-farming rate, based on market rates.  He did so.

Defendants then continue their long-running dispute over the custom-rate book.  *Id.* at 9. That is, defendants don't understand why Kehler would use a 2024 rate book to opine on 2023 custom-farming rates.  Defendants need to read more carefully.  Kehler has explained that the 2024 custom-rate book reflects "average prices from 2023 and 2024 as reported on surveys by the Kansas Department of Ag."  Doc. 97-4 at 1.  So, defendants misunderstand how these booklets work.  And the court agrees with plaintiff.  The 2024 booklet provides reliable data about 2023 custom-farming rates.

Next, defendants attack Kehler for failing to explain why he calculated an average from two geographic areas:  northwest Kansas and north central Kansas.  Doc. 97 at 10.  That's just not right.  Kehler explained that he did so because "Phillips County is on the border between two reporting districts[.]"  Doc. 97-2 at 3.  This doesn't render Kehler's opinions unreliable.

Defendants insist that Kehler needed to provide his methodology for calculating these figures.  Doc. 97 at 12.  Yet Kehler represents that he's provided defendants with two spreadsheets reflecting his calculations.  Doc. 79-62 at 1.  Defendants can complain about this outside-the-report explanation all they want, but the court isn't convinced, as explained in the Rule 37(c)(1) harmlessness analysis above.  *See above* § II.A.2.  Defendants also throw around complaints about error rates, verification, and validation.  Defendants again misunderstand how

13

the *Daubert* standard works in a case like this one.  Kehler isn't doing rocket science.  Kehler explained that he's simply averaging prices.  Doc. 97-4 at 1.

Defendants next argue that Kehler's second opinion—about average crop production—is unreliable because it's based on "self-reported, unverified source material."  Doc. 97 at 12.  The court disagrees.  Kehler has proffered that Kansas agriculture professionals rely on K-State surveys.  Defendants also maintain that this crop-production opinion should have factored in the actual crop production that plaintiff achieved on the fields.  But, again, that's not what Kehler was asked to do.  He was asked to provide an average.  He did so.  That's not a reliability problem.

Defendants also complain that Kehler's crop-production opinion "pulls in data from counties other than Phillips County."  *Id.* at 13.  Yet, in his supplemental affidavit, Kehler explained why he used the north-central and northwest regions:

> i) the applicable farms were located close to the border of the two different regions, ii) the average production of the two regions will most accurately reflect average weather patterns between them, iii) using Kansas regional levels for custom rates provides the most accurate data available for environmentally influenced variations, and iv) accurate environmental data for smaller sample sizes is not available to my knowledge.

Doc. 79-62 at 2.  This explanation convinces the court that Kehler's report is reliable enough for consideration.

In a final heave, defendants assert that Kehler can't proffer his third opinion—that the average figures could apply to the parties' 2023 custom-farming efforts—reliably.  Doc. 97 at 13.  Beating the same dead horse, defendants fault Kehler for "his one-time roadside view."  *Id.* Again, the court has no reliability concerns about Kehler's ability to gain a reliable impression of the land from a visual observation, given his extensive experience in Kansas agriculture.  The scope of that visual observation is fodder for cross-examination.

14

### 3.    Relevance

Defendants' final argument is that Kehler's custom-farming opinions lack relevance. *Id.* at 13–14.  In their view, other custom-farming rates don't matter because plaintiff provided defendants with his rates on the infamous handwritten document.  *Id.*  Defendants have overplayed their hand.  If the court finds that the handwritten document wasn't part of the parties' agreement, then the court will need a way to figure out how much defendants owe plaintiff.  Kehler provides a market rate for those services, which might prove helpful to the task.

True to form, defendants rehash their arguments about the timing of the custom-farming booklet and the geographic areas that Kehler considered.  Defendants can cross-examine Kehler on these issues.  But it doesn't make them irrelevant.  Kehler has explained how the booklet works and why he blended the relevant geographic areas.

Demonstrating the scattershot nature of their motion, defendants bring arguments about Kehler's third opinion—that the land is of standard quality—that aren't relevance arguments. Defendants claim Kehler "does not offer any expertise in viewing or rating crop fields that would bring relevance to his opinions[.]" *Id.*  That's an argument about qualifications, not relevance. And the court already rejected defendants' qualifications argument. *See above* § II.B.1. Defendants then argue that Kehler didn't "break[] down aspects of each of the fields into discrete elements to analyze[.]" Doc. 97 at 14.  That's an argument about reliability, not relevance.  The court already has rejected defendants' reliability argument. *See above* § II.B.2.  And, in any event, Kehler has clarified his method: "the most significant factors would be derived from differences in environmental conditions (including moisture, precipitation, heat, wind, and timing of the foregoing)." Doc. 79-62 at 2.  So, whether framed as a relevance or reliability challenge, defendants fail to persuade.

15

### III.        Conclusion

The court denies defendants' Motion to Exclude (Doc. 97).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to

Exclude (Doc. 97) is denied.

**IT IS SO ORDERED.**

**Dated this 20th day of April, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

16